WISE, Presiding Judge.
 

 The appellant, Wakilii Brown, was convicted of three counts of capital murder for the killings of Dotty Jemison (“Dotty”) and Cherea Jemison (“Cherea”). Count I charged him with murder made capital because he killed Dotty and Cherea pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-40(a)(10), Ala.Code 1975; Count II charged him with the robbery-murder of Dotty,
 
 see
 
 § 13A-5-40(a)(2), Ala.Code 1975; and Count III charged him with the robbery-murder of Cherea,
 
 see
 
 § 13A-5-40(a)(2), Ala.Code 1975. After a sentencing hearing, by a vote of 10-2, the jury recommended that he be sentenced to death. The trial court accepted the jury’s recommendation and sentenced Brown to death. Brown filed a “Motion for New Trial and/or Reconsideration of Sentence,” which the trial court denied after conducting a hearing. This appeal followed.
 

 Because this is a case in which the death penalty has been imposed, we have reviewed the record for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice Brown may raise.
 
 See Ex parte Kennedy,
 
 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 “[This] plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would other
 
 *993
 
 wise result.’ ”
 
 United States v. Young,
 
 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting
 
 United States v. Frady,
 
 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
 

 The following summary of the relevant facts, as prepared by the trial court, may be helpful to an understanding of this case:
 

 “The defendant was indicted, tried and convicted for the capital offense of Capital Murder wherein two or more persons are murdered by the defendant pursuant to one scheme or course of conduct as provided in Section 13A-5-40(a)(10) of the Code of Alabama; the capital offense of Murder, Robbery 1st Degree by the defendant of Dotty Jemi-son as provided in Section 13A-5-40(a)(2) of the Code of Alabama; and the capital offense of Murder, Robbery 1st Degree by the defendant of Cherea Jemison as provided in Section 13A-5-40(a)(2) of the Code of Alabama. The victims of Count 1 were Dotty Jemison and Cherea Jemison; the victim of Count 2 was Dotty Jemison; and the victim of Count 3 was Cherea Jemison. The sole perpetrator of these capital offenses was the defendant, Wakilii Brown. The facts leading up to the commission of these crimes are as follows:
 

 “Dotty Jemison lived at 449 Marion Avenue in the Pinecrest area of Sylacau-ga. Sometime in 2000, Cherea Jemison, Dotty’s daughter, moved in with Dotty Jemison. Cherea was accompanied by her three children, [F.S.], [T.S.] and [K.S.]
 
 [1]
 
 Sometime in the Fall of 2000, the Defendant also moved in with Dotty Jemison. The defendant had a dating relationship with Cherea Jemison and was the father of [T.S. and K.S.]
 

 “On Friday, March 9, 2001, the defendant did some work with Michael Pope. Michael Pope and Aletha Pope, Michael’s wife, paid him for work done and gave him a ride to another location. That was the last time that Michael Pope saw the defendant.
 

 “Saturday, March 10, 2001, was Cher-ea Jemison’s birthday. Family members tried to call the residence at 449 Marion but there was no answer.
 

 “On the same day, the defendant went to the Alabama Trust Bank in Sylacauga to cash a check on Dotty Jemison’s account. The teller, Aletha Pope, told him that she could not cash it because it was on an account on First Federal Bank. The defendant left and came back. He then wanted to cash a check from Cher-ea Jemison’s account (State’s Exhibit # 38 is the check from Cherea’s account, dated 3/10/01 for $200). The defendant told Aletha Pope that the baby, [K.S.], was sick and had an upper respiratory problem and was at Children’s Hospital in Birmingham. Roxanne Womack, an employee of Children’s Hospital in Birmingham, testified that they had no record of a [K.S.] in March of 2001.
 

 “On the same date, a check from the account of Dotty Jemison was cashed by Jennifer Weed, a teller at First Federal Bank. The check was sent from the third drive-through lane, at First Federal Bank in Sylacauga by a black male driving a blue car. (State’s Exhibit # 42 is a check for $200 on Dotty’s account)
 

 “On Sunday, March 11, 2001, neither Dotty Jemison or Cherea Jemison was at church services at the Rising Star Church in Sylacauga. The pastor and
 
 *994
 
 family tried to call the residence at 449 Marion, but did not get an answer.
 

 “On the same date, an anonymous call was placed to Sylacauga Police Department at 5:31 p.m. stating that there was a problem at 449 Marion Ave. Officer Doug Kemp was dispatched to 449 Marion Avenue for a welfare check. No one answered the door and he left the residence. Later that night, at 9:36 p.m., a second caller identified himself as Mr. Adam Murrell and stated that there could be dead bodies in the house. Police officers were again dispatched to 449 Marion Ave. Investigator Mike Smith of Sylacauga Police Department made entrance into the residence through a window and found two bodies. One body of a black female was found in an unlocked bedroom covered with two blankets. She appeared to be dead. The second body was found in a locked bedroom. It was a black female whose ankles and wrists were bound with duct tape and green tape.
 

 “Rozell Lohman, from the Alabama Department of Forensic Sciences, testified that a latent print of value has 9 points or better. He identified the latent prints on inside of a cardboard cylinder that was found next to the body of Dotty Jemison. Latent # 1 is the left thumb of the defendant. Latent # 2 is the left index finger of the defendant. No other latents of value were found.
 

 “Dr. Joseph Embry of the Birmingham Department of Forensic Sciences performed the autopsies of Cherea Je-mison and Dotty Jemison. He testified that Cherea Jemison had a wound in the midline of her face, lacerations deep to the bone, fractured nasal bones and blood under the skin of her eye lid. She also had a laceration in her left ear. Her head was shaved to observe her other wounds. State’s Exhibit # 4 shows the right side of her head and depicts 10 lacerations in her scalp, above her right ear, back of her head and upper part of her right ear. Dr. Embry testified that the lacerations appear to be caused by a blunt object. State’s Exhibit # 5 shows the upper right side of her head and lacerations to the top of her head. State’s Exhibit #11 shows two lacerations behind her left ear, which overlies a large basal skull fracture. There were defensive wounds on her hands, suffered from defending off blows. State’s Exhibit # 14 shows blue bruising and swelling in the ring and little finger of her left hand. Dr. Embry testified that the rigor indicated that it was thirty-six to forty-eight hours after death. The rigor was consistent in Dotty and Cherea Jemison.
 

 “Dr. Embry also testified that Dotty Jemison was bound at the ankles, wrists and was gagged with silver duct tape. There was also green tape on her ankles. State’s Exhibit # 27 depicts four lacerations to the right side of Dotty Jamison’s head and behind her right ear. There was a pattern injury on the top front of Dotty Jemison’s head that was consistent with the claw end of a hammer. State’s Exhibit # 21 depicts the right ring finger was completely fractured. State’s exhibit # 23 shows bruising and swelling between the thumb and forefinger. Dr. Embry testified that Dotty Jemison died as a result of blunt force trauma to the head and that the wounds to Dotty Jemison and Cherea Jemison are similar.
 

 “On Monday, March 12, 2008, a stand off began with the defendant and the Cleveland Crisis Intervention team. Sgt. Larry Hughes testified that he was the Assistant to the Commander of the Crisis Intervention Team in Cleveland, Ohio and that the defendant was barricaded in 405 East 152nd Street in
 
 *995
 
 Cleveland. The stand off with the police lasted for over 24 hours and the defendant only surrendered after being gassed with several canisters of a chemical agent. Sgt. Hughes testified that he was aware of the BOLO for a blue Mazda 626, which was the property of Cherea Jemison and that it was located within close proximity to the barricaded residence. (State’s Exhibit 21) This was the same blue Mazda 626 automobile that was given to Cherea Jemison by Reverend Henry Sanders.
 

 “[T.S.], [F.S.], and [K.S.], the children of Cherea Jemison, were taken from the defendant’s mother’s residence in Cleveland, Ohio and placed in the custody of social services. At the trial of this case, [T.S.] testified that in 2001 she was four years of age and lived with her mom, Cherea, Wakilii, [T.S.], [F.S.] and Ambo (Dotty Jemison). [T.S.] testified that she called the defendant dad when he wasn’t fussing and Wakilii when he was fussing. She testified that the last time she saw her Mom, Cherea Jemison, was in the hallway of their home. [T.S.] testified that Cherea was in the hallway fussing with the defendant and that is what woke [T.S.] up. Her two brothers, [F.S.] and [K.S.], were asleep. [T.S.] looked out of her bedroom door and saw her mother, Cherea Jemison, lying on the floor, with blood on her chest. She was lying on her back with her head closest to [T.S.J’s bedroom door. The defendant was standing over her. Cher-ea’s eyes were closed and she didn’t say anything. [T.S.] ran back to bed, scared and went to sleep.
 

 “Since the law requires only a summary of the crime, the Court believes that the foregoing findings should suffice and will not go into additional details of the facts leading up to the defendant’s conviction. The evidence introduced in the trial was both direct and circumstantial evidence with over 25 witnesses being called and over 120 pieces of evidence being admitted, which overwhelmingly supported the jury’s verdict.”
 

 (C.R. 92-97.)
 

 In addition, Michael Earl Pope testified that Brown worked for him; that, on Friday, March 9, 2001, Brown was working for him as a painter at a house on Settlement Road; that, around 3:00 p.m., it started raining; that he picked up the painters, took them to his house, and paid them; that he gave Brown $50; that Brown asked him for more money; that he did not have any more money, so he had to wait until his wife got off work; that his wife, Aletha Pope, worked at Alabama Trust Bank in Sylacauga; that he picked up Aletha after she got off work; that Brown rode with him; that Aletha gave Brown $10; that he went to a gas station and cashed a $20 check; that he gave the $20 to Brown; that he dropped Brown off on Hammett Street; and that was the last time he saw Brown.
 

 Aletha Pope testified that, in March 2001, she was a teller at Alabama Trust Bank; that she knew Cherea because she was a customer at the bank and because they were both members at the same church; that she knew Dotty from church; and that she knew Brown from church and because he worked’for her husband.
 

 Aletha testified that, on March 9, 2001, Brown came with her husband to pick her up from the bank; that her husband asked her if she had any money to give Brown; that she told him she only had $10, and she gave that to Brown; that they stopped at a gas station, and her husband went inside; that they dropped Brown off on Hammett Street; and that they did not see him again that night. She also testified that, on Saturday, March 10, 2001, Brown came
 
 *996
 
 into the bank and wanted to cash a check on Dotty’s account; that she told him she could not cash the check because it was on a First Federal Bank account, but he could take it to First Federal Bank; that Brown left, but he came back later; that, when he came back, he cashed a $200 check on Cherea’s account; that Brown also wanted her to telephone her husband to see if he would pay him; that Brown told her that the baby, K.S., had an upper respiratory problem and that they had taken him to the Children’s Hospital in Birmingham; that she telephoned her husband and told him that Brown wanted his money; that he told her to take the money from their account and give it to him; and that she took $100 from their account and gave it to Brown. Finally, Aletha testified that she did not see Dotty, Cherea, or the children in church the next day.
 

 Vaunzcea Jemison testified that, in March 2001, she lived in Cleveland, Ohio; that Dotty was her mother, and Cherea was her sister; that, on Friday, March 9, 2001, she traveled to Birmingham for her brother’s wedding; that she was planning to visit her mother and sister; that she left Cleveland on an airplane at 5:00 p.m. and arrived in Birmingham at 10:30 p.m.; that, around 11:00 p.m., she telephoned Dotty and Cherea’s house, but no one answered the telephone; that she tried to telephone them several times on Saturday, March 10, 2001, but was not able to reach them; that she went back to Cleveland on Sunday, March 11, 2001; that she tried to contact Dotty and Cherea several times on Sunday, but she was not able to contact them; that she talked to them at least three times a week on the telephone; that it was unusual that she was not able to contact them on Friday, Saturday, or Sunday; that Dotty and Cherea knew she was going to be in Alabama that weekend; and that, around 11:00 p.m. on Sunday, March 11, 2001, she learned that Dotty and Cherea had been killed.
 

 Manuel Smith III testified that he was the pastor at Rising Star Missionary Baptist Church in Sylacauga; that Dotty was the sister of his wife, Shirley; that Dotty and Cherea attended his church; that he last saw or talked to Dotty and Cherea on the Sunday before their bodies were discovered; that he did not talk to them during the week; that, on Saturday evening, he had heard that K.S. was sick; that he had tried to telephone Dotty and Cher-ea on Saturday evening, but he did not get an answer; and that Dotty, Cherea, and the children were not at church on Sunday. He later learned about the murders from a church member and subsequently identified the bodies of Dotty and Cherea.
 

 Investigator Jeff Mobbs of the Sylacau-ga Police Department testified that, around 10:56 p.m. and 10:57 p.m. on March 11, 2001, he was notified about a situation at 449 Marion Avenue; that he arrived at the scene around 11:05 p.m., and he and the other officers present conferred about the situation; that, shortly thereafter, he and another investigator entered the residence and found bodies in the residence; that he and the other investigator left the residence; and that he called dispatch and requested additional information. He also testified that, based on the information he received from dispatch, he telephoned Adam Murrell; that, after he talked with Murrell, he telephoned a Cleveland, Ohio, telephone number he had received from Murrell; that the person he talked to was a female who identified herself as Betty Washington; that that was between 11:00 p.m. and 11:30 p.m. on March 11, 2001; and that, at some point, officers developed Brown as a suspect.
 

 Adam Murrell testified that he lived in Hope Hull, Alabama; that Brown was his nephew, but he did not know him personal
 
 *997
 
 ly; that Betty Washington was his sister; that, on the evening of March 11, 2001, Washington telephoned him from Cleveland; that Washington asked him to telephone the Sylaeauga Police Department to find out what was going on; that he ultimately telephoned the police department; and that he initially told them that something bad had happened “up there” and that they needed to get in touch with someone to go out to the house. He also testified that, when he telephoned the police department, he told them that something bad had happened and that he could not remember saying anything about somebody being killed. Murrell further testified regarding the sequence of telephone calls between him and Washington and between him and law enforcement authorities.
 

 During the State’s case-in-chief, the State asked to call Betty Washington as a court witness. The State asserted that Washington was Brown’s aunt; that she had been uncooperative with the State; that they had to bring her to Alabama pursuant to an out-of-state witness subpoena; and that she had told one of the assistant district attorneys that she would come and testify truthfully, but they would hear that when she took the witness stand. Over the defense’s objection, the trial court allowed Washington to be called as a court witness.
 

 Betty Washington testified that Brown was her great-nephew; that Brown’s mother, Linda Brown, was her niece; that Murrell was her brother; that she and Linda both lived in Cleveland, Ohio; and that, at the time of trial, she and Linda lived in the same duplex. She also testified that, in March 2001, she lived about ten or fifteen minutes from Linda; that she and Linda had a good relationship and would talk on the telephone and visit one another; that she did not associate with her nephews; that she would see Brown, he would respect her and speak to her, and that was it; that, in March 2001, she knew Cherea, but she was not associated with her; that she did not know Dotty; that she knew that Cherea and Dotty lived in Sylaeauga, but did not know where; and that she had not ever been to their house.
 

 Washington testified that, at some time on Sunday, March 11, 2001, she telephoned Murrell and told him that Brown was in Cleveland and that there were some rumors. However, the State instructed her not to get into the substance of the rumors. She then testified that she told Murrell to try to find out about what was happening; that she did not ask Murrell to telephone the Sylaeauga Police Department; that she did not tell Murrell that there might be someone dead at the house; that she did not tell Murrell that Cherea and her mother were dead in the house; and that she did not know they were dead. She also reviewed telephone records and testified regarding the sequence of telephone calls between her and Murrell and Murrell and law enforcement officers.
 

 Subsequently, the following occurred:
 

 “[PROSECUTOR GIDDENS:] Do you remember — and you’ve given a statement in this case, hadn’t you?
 

 “[WASHINGTON:] Huh?
 

 “[PROSECUTOR GIDDENS:] You’ve talked to Jeff Mobbs and you’ve talked to other police officers?
 

 “[WASHINGTON:] Uh-huh.
 

 “[PROSECUTOR GIDDENS:] Did Wakilii Brown in Cleveland tell you this or this in substance—
 

 “[PROSECUTOR GIDDENS:] Did Wakilii Brown in Cleveland, Ohio, tell you this or this in substance, that he had done something bad, very bad?
 

 “[WASHINGTON:] No.
 

 
 *998
 
 “[PROSECUTOR GIDDENS:] He did not tell you that?
 

 “[WASHINGTON:] No.
 

 “[PROSECUTOR GIDDENS:] That’s all I have. I reserve the right to recall.
 

 “[WASHINGTON:] I didn’t even see Wakilii.”
 

 (R. 639-41.)
 

 After the defense completed its cross-examination of Washington, the State recalled Mobbs. Mobbs testified that, when he talked to Washington on the telephone, she told him that “she had been told by her nephew that he had done something wrong to them girls up there, he had hurt them girls, and that we needed to go in that house and check and see what’s going on.” (R. 646.) He also testified that, at the end of their conversation, Washington told him not to tell anyone about where he had gotten that information.
 

 I.
 

 Brown’s first argument is that the trial court erroneously allowed the State to present inadmissible hearsay.
 

 “ ‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”
 

 Rule 801(c), Ala. R. Evid.
 

 “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
 

 Rule 403, Ala. R. Evid.
 

 A.
 

 Initially, Brown contends that the State presented inadmissible hearsay evidence regarding an alleged confession he made to Betty Washington.
 

 1.
 

 First, Brown asserts that the trial court erroneously allowed Melinda Blankenship, a dispatcher with the Sylacauga Police Department, to testify about two telephone calls she received from Adam Murrell. Specifically, he alleges that Blankenship’s testimony was hearsay; that the statement was offered to show why Blankenship dispatched law enforcement officers to the residence; that Blankenship’s reason for dispatching the officers was irrelevant to his guilt or innocence; that the State cross-examined Murrell about his statements to Blankenship and thus used them for the truth of the matter asserted at that point; and that the admission of Blankenship’s testimony was unduly prejudicial and should have been excluded pursuant to Rule 403, Ala. R. Evid. Brown did not object to Blankenship’s testimony regarding what Murrell told her during his two telephone calls. Therefore, we review his arguments in this regard for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 Blankenship testified that she was on duty on March 11, 2001; that she received an anonymous call from a pay telephone regarding the residence at 449 Marion Avenue; that the anonymous caller said that he felt like something was wrong at the house and that he wanted someone to go to the residence and try to locate anyone or see if anything looked out of place at the house; that she dispatched Officer Doug Kemp to 449 Marion Avenue; that Kemp went to the scene and reported back to her around 5:30 p.m.; and that she did not send any other officers to the scene at that time. She also testified that, around 9:30 p.m., she received a telephone call from Adam Murrell; that, during the initial conversation, Murrell told her that he felt like there was something wrong in Sylacauga,
 
 *999
 
 but he did not have an address; that Mur-rell said he thought he knew someone to call so he could get the address, that he would make a telephone call, and that he would call back; and that, based on the voices, Murrell was not the person who made the initial anonymous telephone call.
 

 Blankenship also testified that Murrell called back a second time; that Murrell gave her his name and telephone number and told her he was calling from Hope Hull, Alabama; that Murrell gave her the address of 449 Marion Avenue; that Mur-rell told her that Cherea Jemison had possibly been killed and that “the girl’s mother was supposed to been there also, she was supposed to also be killed”; and that, based on that information, she dispatched Sergeant Jimmy Parker to the address. (R. 463.)
 

 Blankenship’s testimony that Murrell told her that Cherea and her mother had possibly been killed at 449 Marion Avenue was not offered to show the truth of the asserted therein. Rather, it was offered to show why the officers went to the home and how they discovered the bodies of Dotty and Cherea. It was also offered to establish that Murrell had in fact made the statement, not to show that the substance of the statement was true. Therefore, Blankenship’s testimony about what Mur-rell told her was not hearsay pursuant to Rule 801(c), Ala. R. Evid. Brown contends that the State used Murrell’s statement to Blankenship as substantive evidence when it cross-examined Murrell. However, it appears that the State cross-examined Murrell to establish the fact that he had made the statement, not to show the truth of the matter asserted in the statement. Therefore, the State’s questions regarding the statements he made to Blankenship did not constitute hearsay.
 

 Moreover, the substance of Mur-rell’s statement to Blankenship was that Cherea and Dotty had been killed at their home. Even if the State had attempted to introduce Murrell’s statement to prove the truth of the matter therein, any such evidence was merely cumulative to subsequent testimony that law enforcement officers found Dotty’s and Cherea’s bodies in the home. Further, at no time during Blankenship’s testimony did the State attempt to elicit any testimony that Murrell had made statements that Brown had done something or that Brown was the person who had killed the victims. In fact, during a bench conference, the State specifically asserted that, although Murrell had made such statements, those statements constituted hearsay, and it would not introduce any such statements. Thus, even if the State had used the statement as substantive evidence, error, if any, was harmless.
 
 See
 
 Rule 45, Ala. R.App. P. Finally, the danger of unfair prejudice did not substantially outweigh the probative value of Blankenship’s testimony. Accordingly, we do not find that there was any plain error in this regard.
 

 2.
 

 Brown next asserts that the trial court erroneously allowed the State to read extensively from the unofficial transcript of Murrell’s statement to law enforcement officers. Specifically, he alleges that the reading of the transcript “imper-missibly introduced multiple levels of hearsay evidence” and was unquestionably prejudicial. (Brown’s brief at p. 25.) Brown did not object when the prosecutor read portions of the transcript into evidence. Therefore, we review this argument for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 At trial, Murrell testified that he had problems with his recollection because he had suffered four strokes. Also, he advised the court about his various other
 
 *1000
 
 medical problems and about the fact that he could not read and write. Subsequently, outside the presence of the jury, Investigator Mike Smith read Murrell’s statement aloud for Murrell. Then, in the presence of the jury, the prosecutor questioned Murrell about whether hearing his statement refreshed his recollection regarding the telephone calls he had made to the Sylacauga Police Department. Mur-rell again talked about his problems remembering things and about his various medical problems. After questioning Mur-rell about what he could and could not remember, the State read portions of the transcript to Murrell and asked him if he remembered various portions of the statement. Based on a review of the record, it is clear that the State was not attempting to introduce the transcript of Murrell’s statement to law enforcement officers to prove the truth of the matter asserted therein. Rather, it appears that the State was attempting to refresh Murrell’s recollection. However, the State was limited in its ability to do so based on Murrell’s inability to recall coupled with the fact that he could not read. Accordingly, the prosecutor read small portions of the transcript and then asked Murrell about those specific portions. Therefore, the trial court did not err when it allowed the State to read portions of the transcript during its examination of Murrell. Furthermore, the danger of unfair prejudice did not substantially outweigh the probative value of the State’s questions regarding the various portions of the transcript.
 
 See
 
 Rule 403, Ala. R. Evid. Therefore, the trial court did not err when it allowed the prosecutor to read portions of the transcript during its direct examination of Murrell.
 

 Moreover, the contents of the transcript about which the State questioned Murrell dealt with the telephone calls between Murrell and Washington and Mur-rell and Blankenship. However, both Blankenship and Washington testified about the telephone calls. “[Evidence] that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.”
 
 White v. State,
 
 650 So.2d 538, 541 (Ala.Crim.App.1994), overruled on other grounds,
 
 Ex parte Rivers,
 
 669 So.2d 239 (Ala.Crim.App.1995). Because the portions of the transcript were cumulative to the testimony of Blankenship and Washington, error, if any, in the reading of the transcript was harmless.
 
 See
 
 Rule 45, Ala. R.App. P.
 

 3.
 

 Brown further asserts that, during its cross-examination of Washington, the State “strongly emphasized the hearsay evidence that it had elicited during the testimony of Ms. Blankenship and Mr. Murrell, in order to suggest that Mr. Mur-rell and Ms. Washington knew that the Jemisons were dead.” (Brown’s brief at p. 29.) During the State’s direct examination of Washington, the following occurred:
 

 “[PROSECUTOR:] Then y’all call later on that night, y’all talk for 20 minutes at 11:30. But you know what information he told Sylacauga Police Department after he talked to you?
 

 “[WASHINGTON:] No.
 

 “[PROSECUTOR:] That Dotty — that Cherea Jemison and her mother were dead—
 

 “[WASHINGTON:] Well, I didn’t tell him—
 

 “[PROSECUTOR:] Over there at—
 

 “[WASHINGTON:] I didn’t tell him because I didn’t know it myself.
 

 “[PROSECUTOR:] Well, Mr. Murrell has been in this courtroom. And although he seemed very witty and funny—
 

 
 *1001
 
 “[WASHINGTON:] Uh-huh.
 

 “[PROSECUTOR:] — he claims he’s had four strokes and can’t—
 

 “[WASHINGTON:] He have.
 

 “[PROSECUTOR:] — remember anything.
 

 “[WASHINGTON:] He have. He ain’t playing.
 

 “[PROSECUTOR:] — but he remembered you telling him there were two people dead over there, and you’re saying you didn’t tell him that?
 

 “[WASHINGTON:] I did not tell him that.
 

 “[PROSECUTOR:] Then he calls you back. He tells them—
 

 “[WASHINGTON:] Uh-huh.
 

 “[PROSECUTOR:] ‘Let me get some more information.’ And he calls you. And the next information he relates to Sylacauga Police Department is Cherea Jemison and her mother have been killed in that house—
 

 “[WASHINGTON:] Well, I don’t—
 

 “[PROSECUTOR:] — you did not tell him that?
 

 “[WASHINGTON:] No. No, I did not.”
 

 (R. 637-89.) Brown specifically alleges that the State’s assertions that Murrell said he remembered her telling him that two people were dead was false; that Mur-rell did not testify that Washington had told him that; that, if he had, such a statement would have been hearsay; that the other questions during the exchange were based on previously elicited hearsay; and that the prosecutor used the hearsay evidence to prove the truth of the matter asserted. However, Brown did not present these arguments to the trial court. Therefore, we review them for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 The State did incorrectly assert that Murrell testified that he remembered Washington telling him two people were dead. However, the State presented evidence that Washington telephoned Mur-rell; that, based on that telephone call, Murrell telephoned the Sylacauga Police Department; and that Murrell gave Blankenship the address for Dotty and Cherea and said that they might be dead. Based on this evidence, the jury could have reasonably concluded that Washington had told Murrell that Dotty and Cher-ea were dead. Therefore, any error in the State’s incorrect assertion was harmless.
 
 See
 
 Rule 45A, Ala. R.App. P. Further, contrary to Brown’s assertions, the State’s cross-examination of Washington regarding what Murrell told Blankenship did not amount to substantive evidence about the truth of the matter asserted therein. Moreover, as we noted in Part I.A.I., even if the State had attempted to introduce Murrell’s statement as substantive evidence, it would have been cumulative to testimony that law enforcement officers had found the bodies of Dotty and Cherea in their residence. Therefore, we do not find that there was any plain error in this regard.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 4.
 

 Brown asserts that the trial court erroneously allowed Mobbs to testify about the statement Washington made to him. Specifically, he alleges that the State asserted that it was offering the statement to impeach Washington and that the State did not lay a proper foundation pursuant to Rule 613(b), Ala. R. Evid., for Mobbs’s testimony regarding the statement.
 

 “Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness has been confronted with the circumstances of the statement with sufficient particularity to enable the witness to identify the state
 
 *1002
 
 ment and is afforded an opportunity to admit or to deny having made it.”
 

 Rule 613(b), Ala. R. Evid.
 

 During its cross-examination of Washington, the State asked Washington if Brown had told her he had done something very bad, and Washington said he had not. The State did not ask Washington any more questions. At no time did the State confront Washington with the statement she had made to Mobbs or give Washington an opportunity to admit or deny having made the statement. Therefore, the trial court erroneously allowed the State to present extrinsic evidence about Washington’s statement to Mobbs.
 
 See
 
 Rule 613(b), Ala. R. Evid.
 
 [2]
 
 However, even without Washington’s statement to Mobbs, the State presented overwhelming evidence of Brown’s guilt.
 

 The State presented evidence that Brown had been trying to get money from Michael Pope on the evening of March 9, 2001; that, on the morning of March 10, 2001, Brown went to Alabama Trust Bank in Sylacauga to cash a check on Dotty Jemison’s account, but Aletha Pope told him she could not cash it because it was on a First Federal Bank account; that Brown left and came back with a $200 check on Cherea’s account; that Pope cashed the check; and that, while he was there, Brown told Pope that K.S. was sick and was at Children’s Hospital in Birmingham. However, Roxanne Womack, an employee of Children’s Hospital in Birmingham, testified that they did not have a record of K.S. being in the hospital in March 2001.
 

 The State also presented evidence that on March 9, 2001, Jennifer Weed, a teller at First Federal Bank, cashed a $200 check on Dotty’s account; that the check was sent from the third drive-through lane; that the check was sent by a black male driving a blue car; and that Cherea owned a blue Mazda 626.
 

 The State further presented evidence, that on March 9, 2001, Vaunzcea Jemison had traveled from Cleveland, Ohio, to Birmingham for a wedding; that Vaunzcea tried to telephone Dotty and Cherea around 11:00 p.m. on March 9, 2001, but she was not able to reach them; that Vaunzcea was also unable to reach them on Saturday or Sunday; that Dotty and Cherea knew that Vaunzcea was going to be in Alabama; and that Vaunzcea had had plans to visit Dotty and Cherea.
 

 The State additionally presented evidence that Dotty and Cherea were not at church on Sunday, March 11, 2001; that Manuel Smith had tried to telephone Dotty and Cherea on Sunday; and that Smith was not able to reach them. Around 11:00 p.m. on March 11, 2001, Adam Murrell telephoned the Sylacauga Police Department, gave them the address for Cherea and Dotty, and said that Cherea and her mother might have been killed there; that law enforcement officers went to the home, entered the residence, and found the bodies of Cherea and Dotty; that Dotty’s ankles and hands were bound with duct tape and green “Christmas” tape; that a cardboard roll was attached to the green “Christmas” tape; and that Brown’s fingerprints were on the cardboard roll.
 

 Brown and Cherea’s daughter, T.S., testified that, the last time she saw her mother, she had been sleeping in her room; that her mother and Brown were fussing and woke her up; that her mother and Brown were both screaming; that she got
 
 *1003
 
 up and peeped out her door; that she saw her mother lying on the floor; that her mother’s eyes were closed, and she had blood on her chest; that Brown was standing over her mother; and that she got back into bed and went to sleep.
 

 The State presented evidence that Brown was subsequently located in Cleveland, Ohio; that Brown was involved in a standoff with Cleveland law enforcement officers; that the standoff lasted approximately twenty-four hours; and that Brown left the apartment in which he was located only after numerous canisters of a chemical agent had been fired into the apartment. Cherea’s blue Mazda was located a short distance from the area where Brown had barricaded himself, and law enforcement officers found a checkbook that belonged to Cherea in the vehicle. Finally, F.S., T.S., and K.S. were also located in Cleveland.
 

 Thus, the evidence as to Brown’s guilt was overwhelming. After reviewing the entire record as a whole, “is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty” even without the admission of Washington’s statement to Mobbs.
 
 United States v. Hasting,
 
 461 U.S. 499, 510, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). See
 
 also Chapman v. California,
 
 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under these circumstances, any error in the admission of Washington’s statement to Mobbs was harmless. See Rule 45, Ala. R.App. P.
 

 5.
 

 Brown further asserts that the State improperly referred to notes about Washington’s statement to Mobbs. Specifically, he appears to allege that the State asserted that Mobbs had made the notes; that the notes were actually created by an unidentified author; that the notes constituted inadmissible triple hearsay; and that the State improperly referred to the notes in the presence of the jury. Brown did not object to the State’s references about the notes. Therefore, we review this issue for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 In this case, the notes were not introduced into evidence. Rather, the State referred to the notes when the defense originally asserted that it did not have a copy of any statement Washington made to Mobbs. Also, the parties referred to the notes when the trial court was determining the admissibility of the statement. Therefore, the prosecutor’s reference to the notes did not constitute inadmissible triple hearsay. Moreover, to the extent Brown is again challenging the admission of Washington’s statement to Mobbs, as we found in Part I.A.4., any error in the admission of that statement was harmless. Therefore, Brown is not entitled to relief in this regard.
 

 B.
 

 Brown also contends that the trial court erroneously allowed Manuel Smith to testify about his alleged abuse of Cherea. Specifically, he asserts that the testimony about the abuse constituted inadmissible hearsay and improper character evidence pursuant to Rule 404(b), Ala. R. Evid. Brown did not raise his argument that the testimony constituted improper character evidence before the trial court. Therefore, we review that contention for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 During defense counsel’s cross-examination of Smith, the following occurred:
 

 “[DEFENSE COUNSEL:] Do you recall giving a statement to Mike Smith back, it looks like the 21st of March of 2001, where you sat down and you were talking to Mike Smith?
 

 
 *1004
 
 “[SMITH:] I’ve talked to him on several occasions, yes, sir.
 

 “[DEFENSE COUNSEL:] Well, this would have been right after the ladies were found in the house or shortly thereafter. And at the time, they asked you this or this in substance, something about Mr. Brown going back to Cleveland. You said he went back to Cleveland twice. He got some money. And you said Cherea was mad and talked to your wife. I guess that’s Shirley. And they asked the question or Mike Smith asked the question, ‘Did she ever mention any kind of violence or anything?’ And you said ‘To me, no.’ Do you recall that?
 

 “[SMITH:] I’m sorry. Say it again, sir.
 

 “[DEFENSE COUNSEL:] He asked you the question that ‘she,’ I’m taking that as Cherea, ever mentioned any kind of violence or anything, and you answered ‘To me, no.’ That’s what you told Mike Smith?
 

 “[SMITH:] She didn’t.
 

 “[DEFENSE COUNSEL:] And you then said, ‘I’m sure she mentioned some stuff to my wife. She didn’t mention it to me at all.’ Is that right or wrong?
 

 “[SMITH:] She didn’t talk to me about the violence.”
 

 (R. 364-66.) Subsequently, during the State’s redirect examination of Smith, the following occurred:
 

 “[PROSECUTOR:] Pastor Smith, [defense counsel] was asking you whether Cherea had confided in you about any prior domestic violence, and you indicated that she had not. Had she confided that in your wife?
 

 “[DEFENSE COUNSEL:] I object to that, Judge.
 

 “[PROSECUTOR:] Judge, he’s opened the door and asked the questions.
 

 “[DEFENSE COUNSEL:] That would be hearsay, anything his wife—
 

 “[PROSECUTOR:] He asked the question. We didn’t go into it.
 

 “THE COURT: You can answer the question. Go ahead.
 

 “[SMITH:] Yes, ma’am.
 

 “[PROSECUTOR:] On several occasions?
 

 “[SMITH:] Many occasions.”
 

 (R. 368.)
 

 “When one party opens the door to otherwise inadmissible evidence, the doctrine of ‘curative admissibility’ provides the opposing party with ‘the right to rebut such evidence "with other illegal evidence.’
 
 McElroy’s Alabama Evidence,
 
 § 14.01, p. 49 (5th ed. 1996). ‘[T]he law [i]s that even though a party introduces evidence that may be immaterial or illegal, his opponent has the right to rebut such evidence and this right is unconditional.’
 
 Clark v. State,
 
 54 Ala.App. 183, 186, 306 So.2d 51, 54 (1974). ‘ “A party who has brought out evidence on a certain subject has no valid complaint as to the trial court’s action in allowing his opponent or adversary to introduce evidence on the same subject.” ’
 
 Hubbard v. State,
 
 471 So.2d 497, 499 (Ala.Crim.App.1984) (quoting
 
 Brown v. State,
 
 392 So.2d 1248, 1260 (Ala.Crim.App.1980), cert. denied, 392 So.2d 1266 (Ala.1981)).”
 

 Ex parte D.L.H.,
 
 806 So.2d 1190, 1193 (Ala.2001).
 

 In this case, during its direct examination, the State did not question Smith regarding any allegations of prior abuse Cherea may have made to him or to his wife. Rather, defense counsel raised this issue during its cross-examination of
 
 *1005
 
 Smith and brought out Smith’s statement to law enforcement officers that he was sure Cherea had mentioned prior abuse to his wife. On redirect, the State did not elicit any specific details regarding those allegations. Rather, the State merely clarified the testimony elicited by the defense. Based on its cross-examination of Smith, the defense opened the door to evidence regarding prior allegations of abuse the victim made to Smith’s wife. Therefore, we do not find that there was any plain error in this regard.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 II.
 

 Brown’s second argument is that the trial court erroneously allowed T.S. to testify at trial.
 

 A.
 

 Initially, Brown contends that T.S. was not competent to testify based on her age at the time of the offense and the length of time between the murders and trial and that the trial court should have conducted a more extensive voir dire of T.S. and tested the reliability of her memory. Brown did not present any of these arguments to the trial court. Therefore, we review them for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 “Every person is competent to be a witness except as otherwise provided in these rules.”
 

 Rule 601, Ala. R. Evid.
 

 “[Rule 601] acknowledges the prevailing sentiment that very few persons are incapable of giving testimony useful to the trier of fact and that the historic grounds of incompetency — mental incapacity, conviction, etc. — should go to the credibility of the witness and the weight the trier of fact gives to the witness’s testimony. See H. Weihofen,
 
 Testimonial Competence and Credibility,
 
 34 Geo. Wash. L.Rev. 53 (1965); E. Cleary,
 
 McCormick on Evidence
 
 § 71 (3d ed. 1984) (referring to rules of incompetency as ‘serious obstructions to the ascertainment of truth’); C. Mueller & L. Kirkpatrick, 3 Federal Evidence § 232 (2d ed. 1994); Comment,
 
 The Mentally Deficient Witness: The Death of Incompetency,
 
 14 Law & Psychol. Rev. 106 (1990).
 

 “While Rule 601 imposes no requirement of testimonial competency, it provides that incompetency may arise ‘as otherwise provided in these rules.’ Both academic writings and judicial opinions suggest that this provision vests in the trial court the discretion to preclude a witness from testifying in extraordinary circumstances when the witness possesses some significant testimonial deficiency. That discretion is said to arise when the witness’s deficiency renders the testimony inadmissible because of its being irrelevant (Rule 401) or too prejudicial (Rule 403), or when the witness is without personal knowledge (Rule 602) or is unable to understand the obligation to tell the truth (Rule 603). See, e.g.,
 
 United States v. Ramirez,
 
 871 F.2d 582 (6th Cir.), cert. denied, 493 U.S. 841 (1989);
 
 United States v. Odom,
 
 736 F.2d 104 (4th Cir.1984);
 
 United States v. Lightly,
 
 677 F.2d 1027 (4th Cir.1982);
 
 State v. Fulton,
 
 742 P.2d 1208 (Utah 1987) cert. denied, 484 U.S. 1044 (1988). See also J. Weinstein & M. Berger
 
 Weinstein’s Evidence
 
 ¶ 601[04], at 601-27 (1990)., It should be noted, however, that the suggestion of these authorities exceeds their reality in terms of witnesses actually excluded by the courts. Indeed, as one author has observed, an analysis of the decided cases reveals that the application of Rule 601 is ‘closer to an irrebuttable presumption of com
 
 *1006
 
 petency for every witness.’ Comment,
 
 The Mentally Deficient Witness: The Death of Incompetency,
 
 14 Law & Psychol. Rev. 106, 114 (1990). The beginning premise remains: all witnesses are competent and any testimonial deficiency goes to weight rather than admissibility. See F. Weissenberger,
 
 Weissenberger’s Federal Evidence
 
 § 601.2, at 181 (1987); 3 D. Louisell & C. Mueller,
 
 Federal Evidence
 
 § 252 (1979). Compare
 
 United States v. Van Meerbeke,
 
 548 F.2d 415 (2d Cir.1976), cert. denied, 430 U.S. 974 (1977).”
 

 Rule 601, Ala. R. Evid., Advisory Committee’s Notes. Finally, this court has addressed the competency of a child witness as follows:
 

 “The appellant next contends that the trial court erred in allowing the appellant’s seven-year-old son to testify at trial. The appellant contends that he was not competent to take the witness stand because of his age. ‘There is no age at which competency is presumed. A four-year old can testify in cases other than sexual abuse or sexual exploitation if he or she has first been determined to be competent.’
 
 Price v. State,
 
 590 So.2d 381, 382 (Ala.Cr.App.), aff'd, 590 So.2d 383 (Ala.1991).
 

 “In the present case the trial court questioned the child before he was allowed to testify. It appears from the record that the child was very articulate for a seven-year-old. In fact there was no objection to his testimony during the trial. We find no error in the trial court’s acceptance of the child as a competent witness.
 
 Cole v. State,
 
 443 So.2d 1386 (Ala.Cr.App.1983);
 
 Miller v. State,
 
 391 So.2d 1102 (Ala.Cr.App.1980).”
 

 Stewart v. State,
 
 601 So.2d 491, 503 (Ala.Crim.App.1992), overruled on other grounds by
 
 Ex parte Gentry,
 
 689 So.2d 916 (Ala.1996).
 

 In this case, the trial court ascertained that T.S. was eleven years old and in the sixth grade at the time of trial. It also ascertained that T.S. understood that she had been called to testify and that it was of utmost importance that she tell the truth. Finally, the trial court ascertained that T.S. went to Sunday school and church; that she had learned about being honest and truthful; that she knew it would be right for her to testify truthfully; that she could get into trouble if she did not tell the truth; and that, if permitted to testify, she would tell the truth. For these reasons, the trial court adequately established that T.S. was competent to testify. T.S.’s age at the time of the murders, the length of time between the murders and the trial, and the reliability of T.S.’s memory were considerations that went to the weight of her testimony rather than its admissibility. Therefore, we do not find that there was any error, plain or otherwise, in this regard.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 B.
 

 Brown also contends that that the trial court impermissibly indicated its favor of T.S.’s testimony during its voir dire examination of T.S. Specifically, he asserts that “[t]he court’s gentle questioning emphasized that [T.S.] was a churchgoing child who understood right from wrong.” (Brown’s brief at p. 55.) Brown did not present this argument to the trial court. Therefore, we review it for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 In
 
 Long v. State,
 
 611 So.2d 443, 445 (Ala.Crim.App.1992), this court addressed the questioning of a child victim in front of the jury as follows:
 

 “Long contends that the trial court erred in denying his motion for mistrial
 
 *1007
 
 on the ground that the court examined the victim in front of the jury to determine his capacity to testify before the State’s examination of the victim.
 

 “This court has consistently held that the trial court has considerable discretion in the conduct of a trial, and unless clearly abused, its decision in exercising that discretion will not be overturned on appeal.
 
 Burkett v. State,
 
 439 So.2d 737 (Ala.Crim.App.1983).
 

 “In the instant case, there is nothing in the record to support a finding that the trial court clearly abused its discretion in questioning the victim in front of the jury before the State’s examination of the victim, and the court’s questions to the victim did not in any manner indicate favor or disfavor toward the witness. The trial court therefore properly denied Long’s motion for mistrial on this ground.”
 

 In this case, the trial court questioned T.S. in a manner to put her at ease. Also, the trial court questioned T.S. regarding the fact that she went to church and Sunday school to determine T.S.’s ability to understand the oath and her ability to understand the importance of telling the truth. However, the trial court’s questioning of T.S. did not indicate any favor or disfavor toward T.S. Therefore, we do not find that there was any error, plain or otherwise, in this regard.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 III.
 

 Brown’s third argument is that the trial court should have dismissed the indictment against him based on a denial of his right to a speedy trial. He raises this argument for the first time on appeal. Therefore, we review this argument for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P. In
 
 Barker v. Wingo,
 
 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court set forth the following factors that must be weighed when reviewing a speedy trial claim: (1) the length of the delay; (2) the reason for the delay; (3) the accused’s assertion of his right to a speedy trial; and (4) the degree of prejudice the accused suffered due to the delay. In
 
 Ex parte Walker,
 
 928 So.2d 259 (Ala.2005), the Alabama Supreme Court provided guidance as to the proper application of those factors.
 

 The pertinent dates and events in this ease are as follows:
 

 March 11, 2001 — Law enforcement officers discovered the bodies of Dotty and Cherea Jemison.
 

 March 13, 2001 — Brown was taken into custody by the Cleveland Police SWAT Unit.
 

 June 28, 2001 — Brown was indicted for three counts of capital murder for the killings of Dotty and Cherea.
 

 June 29, 2001 — Brown made an initial appearance in the Talladega District Court.
 

 July 10, 2001 — Jeb Fannin and Bill Will-ingham were appointed to represent Brown.
 

 July 16, 2001 — Brown was arraigned. The State filed a motion for discovery.
 

 August 29, 2001 — Brown filed a request for production by the State.
 

 February 4, 2002 — The case called for a status call and, on Brown’s motion, the trial court continued the case to the March 4, 2002, Criminal Status Call Docket.
 

 March 28, 2002 — The defense filed a motion for a court-ordered mental examination of Brown.
 

 June 19, 2002 — The trial court ordered a mental examination to determine Brown’s mental condition to stand trial and/or to evaluate his mental state at the time of the offense.
 

 
 *1008
 
 November 6, 2002 — Dr. Glen King, a certified forensic examiner, filed his forensic evaluation report.
 

 January 21, 2003 — Brown filed a “Motion for Funds for Expert Psychiatric and Psychologic Assistance.”
 

 January 31, 2003 — The trial court granted Brown’s “Motion for Funds for Expert Psychiatric and Psychological Assistance.”
 

 March 3, 2003 — Fannin and Willingham filed a motion to withdraw as counsel of record.
 

 April 7, 2003 — Fanning and Willingham withdrew their motion to withdraw.
 

 May 5, 2003 — Brown filed a “Motion for Funds to Hire an Expert to Assist in Guilt Phase Investigation of Case.”
 

 May 7, 2003 — The trial court granted Brown’s motion for funds to hire an expert subject to the defense submitting anticipated costs.
 

 May 28, 2003 — The trial court entered an order allowing Brown to hire Dr. Marianne G. Rosenzweig as a psychiatric and psychological expert.
 

 June 17, 2003 — The trial court entered an order that provided Brown funds to hire a private investigator.
 

 October 30, 2004 — Brown filed a “Motion for Funds for Investigation” requesting the funds to employ a mitigation expert. The trial court granted the motion and allowed Brown to employ Lucia Penland as a mitigation investigator.
 

 April 19, 2004 — The trial court set a status conference for September 2, 2004.
 

 May 17, 2004 — The case was heard on the Criminal Status Call Docket. The case was continued by agreement to the August 16, 2004, Criminal Status Call Docket.
 

 May 27, 2004 — The trial court entered an order to transport Brown to the crime scene.
 

 June 24, 2004 — Brown filed a “Motion for Funds for Neuropsychologist.”
 

 September 2, 2004 — The trial court conducted a status conference.
 

 September 13, 2004 — The trial court entered its “Court Findings at Status Conference” from the September 2, 2004, status conference. The trial court ordered the defense to provide copies of the report prepared by Rosenzweig to the State and ordered that the State provide copies of all videotapes from the State of Ohio to the defense on or before October 1, 2004. It also noted that the defense had advised the court that Dr. John Goff would not be able to see the appellant until after November 1, 2004. However, it ordered the defense to provide Goffs report after it was completed. The trial court also noted that the State made an oral motion for Brown to undergo an intelligence quotient test at Taylor-Hardin Secure Medical Facility, that the defense did not object and that it would enter a separate order directing such a test. Finally, it noted that, based on discussions between the parties, the earliest possible date for the case to be tried would be the February 2005 term of court, but that would be subject to the completion of reports and evaluations and the availability of witnesses.
 

 September 13, 2004 — The trial court entered “Order Directing Intelligence Quotient Examination,” of Brown.
 

 September 20, 2004 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the October 18, 2004, Criminal Status Call Docket.
 

 
 *1009
 
 September 22, 2004 — The defense notified the court that it would probably be November 2004 before Dr. Rosenzweig would be able to submit a report regarding Brown.
 

 September 30, 2004 — The trial court entered an order for funds for Brown to hire Dr. John Goff as a neuropsychol-ogist.
 

 October 10, 2004 — The case was called for a Criminal Status Call Docket. On Brown’s motion, the case was continued to the November 15, 2004, Criminal Status Call Docket.
 

 November 15, 2004 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the January 24, 2005, Criminal Status Docket.
 

 November 19, 2004 — The trial court set a status conference for March 9, 2005.
 

 January 14, 2005 — King filed a second forensic evaluation report.
 

 January 24, 2005 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the February 23, 2005, Criminal Status Call Docket.
 

 February 23, 2005 — The case was called for a Criminal Status Call Docket. On Brown’s motion, the case was continued to the March 21, 2005, Criminal Call Docket.
 

 March 9, 2005 — The trial court conducted a special status conference.
 

 March 10, 2005 — The trial court entered its “Court’s Findings at Status Conference and Order,” from the March 9, 2005, special status conference. In its order, the trial court ordered Brown to give the State the reports of Rosenzweig and Goff; ordered Brown to give the court records that were in the possession of the defense and that might be subject to the State’s motion for discovery so that it could make an in camera inspection of those records; and ordered the State to give the defense any discoverable items, including any videotapes, from the State of Ohio. It also noted that, based on the discussion between the parties, the earliest possible date for trial would be the term beginning on May 9, 2005, but that was subject to the availability of witnesses.
 

 March 18, 2005 — Brown filed a “Motion for Individual Voir Dire.”
 

 March 21, 2005 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the April 18, 2005, Criminal Status Call Docket.
 

 March 23, 2005 — The trial court set a status conference for April 8, 2005.
 

 March 28, 2005 — Brown filed a motion requesting a trial by unanimous jury as to the issue of determining the existence of any aggravating circumstances and as to his ultimate sentence if the State were to seek the death penalty. Brown also filed a “Motion to Amend Order,” seeking additional funds for Rosenzweig’s services.
 

 April 8, 2005 — The trial court entered its “Court’s Findings at Status Conference and Order.” In that order, it denied Brown’s motion for individual voir dire; stated that it was going to hold Brown’s “Motion to Amend Order” in abeyance; and denied Brown’s motion regarding the unanimous jury determination as to sentencing. It also stated that, based on the discussion between the parties, the trial might be postured for the trial term that would start on May 9, 2005, but that would be subject to the availability of witnesses.
 

 
 *1010
 
 April 11, 2005 — The trial court entered its “Order Upon In Camera Inspection of Defendant’s Record.”
 

 April 19, 2005 — The trial court set a special status conference for May 9, 2005.
 

 May 6, 2005 — The trial court conducted a special status conference. When the case was called, the State moved for a continuance based on a witness scheduling problem for the May 9, 2005, trial date. The trial court granted the motion for a continuance over Brown’s objection and scheduled the trial for the week of September 12, 2005. The trial court also set a special status conference for September 8, 2005.
 

 September 13, 2005 — The trial court entered its “Court Findings at Status Conference and Order,” from the September 8, 2005, status conference. The order indicated that the parties had discussed possible trial dates in this case. The trial court ordered the parties to determine whether their witnesses would be available for trial the week of November 14, 2005, and to notify the court regarding their availability before September 23, 2005. It also indicated that, if there were any complications with the availability of witnesses, the trial would be set for the February 2006 term.
 

 September 19, 2005 — The case was called for a Criminal Status Call Docket. The case was continued to the October 17, 2005, Criminal Status Call Docket.
 

 October 17, 2005 — The case was called for a Criminal Status Call Docket. The case was continued to the November 21, 2005, Criminal Status Call Docket.
 

 November 21, 2005 — The case was called for a Criminal Status Call Docket. The case was continued to the January 23, 2006, Criminal Status Call Docket.
 

 January 12, 2006 — The trial court conducted a special status conference. After a discussion among the attorneys, the trial court set Brown’s trial for February 13, 2006, subject to the availability of witnesses.
 

 January 19, 2006 — The State filed a “State’s Motion for Additional Discovery,” asking the trial court to order Brown to submit to a “ ‘major-case fingerprinting’ examination.”
 

 January 26, 2006 — The trial court entered an order granting the “State’s Motion for Additional Discovery.”
 

 February 6, 2006 — The State filed a “Joint Motion to Continue” to continue the trial from the February 13, 2006, trial docket to the March 13, 2006, trial docket based on the unavailability of a witness who was material the defense.
 

 February 22, 2006 — -The case was called for a Criminal Status Call Docket. The case was continued by agreement to the March 27, 2006, Criminal Status Call Docket.
 

 March 27, 2006 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the April 17, 2006, Criminal Status Call Docket because the DNA report was still outstanding.
 

 April 17, 2006 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the May 15, 2006, Criminal Status Call Docket because the DNA report was still outstanding.
 

 May 15, 2006 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the July 24, 2006, Criminal Status Call Docket because the DNA report was still outstanding.
 

 July 24, 2006 — The case was called for a Criminal Status Call Docket. The
 
 *1011
 
 case was continued by agreement to the August 14, 2006, Criminal Status Call Docket because the DNA report was still outstanding.
 

 August 14, 2006 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the September 18, 2006, Criminal Status Call Docket because the DNA report was still outstanding.
 

 September 18, 2006 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the October 16, 2006, Criminal Status Call Docket because the DNA report was still outstanding.
 

 October 16, 2006 — -The case was called for a Criminal Status Call Docket. The case was continued by agreement to the November 20, 2006, Criminal Status Call Docket because the DNA report was still outstanding.
 

 November 20, 2006 — The case was called for a Criminal Status Call Docket. The case was continued to the January 30, 2007, Criminal Status Call Docket and set for trial on February 26, 2007.
 

 January 30, 2007 — The case was called for a Criminal Status Call Docket. After both parties announced that they were ready, the trial court set the case for the March 26, 2007, criminal trial docket. It also set a special status conference for February 9, 2007.
 

 February 9, 2007 — The trial court conducted a special status conference. After both parties announced that they were ready, the trial court set the trial for March 26, 2007, subject to the availability of witnesses.
 

 March 2, 2007 — Brown filed a “Motion for Funds for Transportation for Mitigation Witness.”
 

 March 6, 2007 — The case was called for a Criminal Status Call Docket. The State moved for a continuance. Over Brown’s objection, the trial court continued the case to the April 3, 2007 Criminal Status Call Docket.
 

 March 8, 2007 — The trial court set Brown’s “Motion for Funds for Transportation for Mitigation Witness,” for a hearing on March 16, 2007.
 

 March 16, 2007 — The trial court conducted a hearing on Brown’s “Motion for Funds for Transportation for Mitigation Witness” and granted the motion. It also set Brown’s case for trial on May 21, 2007.
 

 March 21, 2007 — The trial court entered an order granting Brown’s motion for funds for transportation of a mitigation witness.
 

 May 8, 2007 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the June 18, 2007, criminal trial docket and the May 29, 2007, Criminal Status Call Docket.
 

 May 29, 2007 — Brown filed a motion to continue because a necessary witness would not be available. The case was called for a Criminal Status Call Docket. Upon Brown’s motion, the case was continued for trial until August 20, 2007, and set for the June 26, 2007, Criminal Status Call Docket.
 

 August 17, 2007 — The State filed a motion to continue because it was in the process of obtaining service of a subpoena for an out of state witness. The case was called for a Criminal Status Call Docket. The trial court continued the case for trial until September 17, 2007, and noted that the State was trying another capital murder case.
 

 August 28, 2007 — The case was called for a Criminal Status Call Docket. The case was continued by agreement
 
 *1012
 
 to the September 25, 2007, Criminal Status Call Docket.
 

 September 25, 2007 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the October 30, 2007, Criminal Status Call Docket.
 

 October 30, 2007 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the December 4, 2007, Criminal Status Call Docket, and the case was set for trial on February 25, 2008.
 

 December 4, 2007 — The case was called for a Criminal Status Call Docket. The case was continued by agreement to the January 29, 2008, Criminal Status Call Docket and set for the February 25, 2008, trial docket.
 

 December 6, 2007 — The trial court conducted a special status conference. The trial court scheduled another special status conference for January 3, 2008.
 

 December 19, 2007 — Brown filed a “Motion for Change of Place of Trial.”
 

 January 30, 2008 — The trial court scheduled a motion hearing for February 19, 2008.
 

 February 25, 2008 — The appellant’s trial started.
 

 A. LENGTH OF THE DELAY
 

 Unless the delay is sufficiently lengthy to be presumptively prejudicial, it is not necessary to consider the remaining
 
 Barker
 
 factors.
 
 See Barker,
 
 supra;
 
 Zumbado v. State,
 
 615 So.2d 1223 (Ala.Crim.App.1993). The length of the delay is measured either from the date of the formal indictment or from the date of arrest, whichever occurred first.
 
 See Nickerson v. State,
 
 629 So.2d 60 (Ala.Crim.App.1993). Accordingly, the length of delay in this case is measured from the date the appellant was taken into custody on March 13,. 2001, until the date his trial began, which was approximately 83 months. This court has previously found that shorter delays than this were presumptively prejudicial and required an examination of the remaining
 
 Barker
 
 criteria.
 
 See, e.g., Vincent v. State,
 
 607 So.2d 1290 (Ala.Crim.App.1992) (holding that a 31-month delay was presumptively prejudicial). Therefore, we will examine the remaining
 
 Barker
 
 factors.
 

 B. REASONS FOR THE DELAY
 

 In
 
 Walker,
 
 928 So.2d at 265, the supreme court set forth the following standard for evaluating the reasons for the delay:
 

 “Barker
 
 recognizes three categories of reasons for delay: (1) deliberate delay, (2) negligent delay, and (3) justified delay. 407 U.S. at 531, 92 S.Ct. 2182. Courts assign different weight to different reasons for delay. Deliberate delay is “weighted heavily against the State. 407 U.S. at 531, 92 S.Ct. 2182, 33 L.Ed.2d 101. Deliberate delay includes an ‘attempt to delay the trial in order to hamper the defense’ or ‘ “to gain some tactical advantage over (defendants) or to harass them.” ’ 407 U.S. at 531 & n. 32, 92 S.Ct. 2182 (quoting
 
 United States v. Marion,
 
 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). Negligent delay is weighted less heavily against the State than is deliberate delay.
 
 Barker,
 
 407 U.S. at 531, 92 S.Ct. 2182, 33 L.Ed.2d 101;
 
 Ex parte Carrell,
 
 565 So.2d [104,] 108 [(Ala.1990)]. Justified delay — which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible— is not weighted against the State.
 
 Barker,
 
 407 U.S. at 531, 92 S.Ct. 2182, 33 L.Ed.2d 101;
 
 Zumbado v. State,
 
 615 So.2d 1223, 1234 (Ala.Crim.App.1993) (‘ “Delays occasioned by the defendant or on his behalf are excluded from the
 
 *1013
 
 length of delay and are heavily counted against the defendant in applying the balancing test of
 
 Barker.”
 
 ’) (quoting
 
 McCallum v. State,
 
 407 So.2d 865, 868 (Ala.Crim.App.1981)).”
 

 In this case, there is not any indication that the State deliberately or negligently delayed the trial in any way. In this case, the State initially announced ready on January 30, 2007. It also announced that it was ready again on February 9, 2007. There are several instances where it is not entirely clear why the trial was continued. However, the record indicates that, over the course of the proceedings, the State specifically requested only three continuances on its own behalf. Although the record does not indicate the reason the State requested its second continuance, it does indicate that the State requested its first continuance due to a scheduling issue with a witness and that it requested its third continuance because it was in the process of obtaining service of a subpoena for an out-of-state witness. Further, when it granted the State’s third motion to continue, the trial court noted that the State would be trying another capital murder case. Thus “we see no deliberate delay by the State to enhance its own case or to prejudice the defense.”
 
 Irvin v. State,
 
 940 So.2d 331, 343 (Ala.Crim.App.2005).
 

 Additionally, some of the delay in this case was caused by neutral reasons that are not attributable to either the State or Brown. Initially, we note that this was a capital case, and the investigation was conducted, forensic analysis was performed, psychological testing was done, and discovery was conducted. In fact, the record indicates that the case was continued by agreement on several occasions because the parties were still awaiting the results of DNA testing. Also, the trial court conducted numerous docket calls, status conferences, and hearings to deal with various issues that arose during the preparation of this case. Neutral reasons for delay do not ordinarily require a dismissal of the case based on a violation of the right to a speedy trial.
 
 See Pierson v. State,
 
 677 So.2d 830, 831 (Ala.Crim.App.1996).
 

 Further, contrary to Brown’s assertions in his brief to this court, it appears that the majority of the reasons for the delay are, at least partially, attributable to the defense. The record indicates that Brown specifically requested two continuances. However, the record also indicates that there was one joint request for a continuance due to the unavailability of a necessary defense witness. The record further indicates that there were numerous instances where the case was continued by the agreement of the parties. Therefore, at the very least, the defense acquiesced to those continuances. Thus, the majority of the delay was justified delay that was attributable to Brown, and it weighs heavily against Brown rather than against the State.
 

 C. BROWN’S ASSERTION OF RIGHTS
 

 In
 
 Walker,
 
 928 So.2d at 265-66, the supreme court set forth the following guidelines for evaluating this prong of the
 
 Barker
 
 test:
 

 “An accused does not waive the right to a speedy trial simply by failing to assert it.
 
 Barker,
 
 407 U.S. at 528. Even so, courts applying the
 
 Barker
 
 factors are to consider in the weighing process whether and when the accused asserts the right to a speedy trial, 407 U.S. at 528-29, and not every assertion of the right to a speedy trial is weighted equally.
 
 Compare Kelley v. State,
 
 568 So.2d 405, 410 (Ala.Crim.App.1990) (‘Repeated requests for a speedy trial weigh
 
 *1014
 
 heavily in favor of an accused.’),
 
 with Clancy v. State,
 
 886 So.2d 166, 172 (Ala.Crim.App.2003) (weighting third factor against an accused who asserted his right to a speedy trial two weeks before trial, and stating: ‘ “The fact that the appellant did not assert his right to a speedy trial sooner ‘tends to suggest that he either acquiesced in the delays or suffered only minimal prejudice prior to that date.’ ” ’) (quoting
 
 Benefield v. State,
 
 726 So.2d 286, 291 (Ala.Crim.App.1997), additional citations omitted), and
 
 Brown v. State,
 
 392 So.2d 1248, 1254 (Ala.Crim.App.1980) (no speedy-trial violation where defendant asserted his right to a speedy trial three days before trial).
 

 “In this case, Walker asserted her right to a speedy trial one time — less than five months after she was arrested. The Court of Criminal Appeals did not explicitly weigh this factor against the State. But the trial court found — and the State conceded — that this factor weighs against the State. We also find that this factor weighs in Walker’s favor.
 

 “We note, however, that the record does not show whether Walker knew of the pendency of the indictment during the three years between her indictment and her arrest. Although the accused has no obligation to bring herself to trial,
 
 Barker,
 
 407 U.S. at 527,
 
 Smith v. State,
 
 409 So.2d 958, 962 (Ala.Crim.App.1981), in determining whether to presume prejudice under the fourth
 
 Barker
 
 factor, courts have emphasized the accused’s ignorance of outstanding charges during the period from indictment until arrest.
 
 See, e.g., Doggett [v. United
 
 States], 505 U.S. [647,] 653-54 [(1992)] (holding that where there was unrebut-ted evidence that the accused was ignorant of the charges against him during the 8 1/2 years between his indictment and arrest, the accused was ‘not to be taxed for invoking his speedy trial right only after his arrest’);
 
 [Ex parte] Clopton,
 
 656 So.2d [1243,] 1244 [ (Ala.1995) ] (recognizing that before his arrest, the accused’s ignorance of the indictment was ‘undisputed’). Accordingly, in a case involving delay caused by negligence on the part of the state, the third factor usually will weigh more heavily in the accused’s favor when there is affirmative proof of the accused’s ignorance of the charges against her during the delay.
 
 See Doggett,
 
 505 U.S. at 653-54;
 
 Clopton,
 
 656 So.2d at 1244. In Walker’s case, however, there is no conclusive proof one way or the other regarding her knowledge of the charges during the delay between her indictment and her arrest. Consequently, this factor weighs in Walker’s favor, but not as heavily as it would if the record affirmatively showed that she did not know of the charges during the time from her indictment until her arrest.”
 

 (Footnotes omitted.)
 

 Brown did not file a pre-trial motion for a speedy trial. Rather, he waited until this appeal to argue that he had been denied his right to a speedy trial. Although Brown argues that, on two occasions, he objected to the State’s requests for a continuance, the record does not indicate the grounds for such objections. The record also indicates that, after the defense objected to the State’s first request for a continuance, the case was continued by agreement several times and that some of those continuances were due to the fact that the parties were still waiting for the results of forensic testing. Finally, the record indicates that, after the defense objected to the State’s second request for a continuance, the case was continued by agreement four more times and that the defense also requested a continuance based on the unavailability of a wit
 
 *1015
 
 ness. Therefore, this factor weighs against Brown.
 

 D. PREJUDICE TO THE APPELLANT
 

 In
 
 Walker,
 
 928 So.2d at 266-67, the supreme court explained:
 

 “Because ‘pretrial delay is often both inevitable and wholly justifiable,’
 
 Dog-gett [v. United
 
 States], 505 U.S. [647,] 656, 112 S.Ct. 2686 [ (1992) ], the fourth
 
 Barker
 
 factor examines whether and to what extent the delay has prejudiced the defendant.
 
 Barker,
 
 407 U.S. at 532, 92 S.Ct. 2182. The United States Supreme Court has recognized three types of harm that may result from depriving a defendant of the right to a speedy trial: ‘ “oppressive pretrial incarceration,” “anxiety and concern of the accused,” and “the possibility that the [accused’s] defense will be impaired” by dimming memories and loss of exculpatory evidence.’
 
 Doggett,
 
 505 U.S. at 654, 112 S.Ct. 2686 (quoting
 
 Barker,
 
 407 U.S. at 532, 92 S.Ct. 2182, and citing
 
 Smith v. Hooey,
 
 393 U.S. 374, 377-79, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969);
 
 United States v. Ewell,
 
 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966)). ‘Of these forms of prejudice, “the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.’” 505 U.S. at 654, 112 S.Ct. 2686 (quoting
 
 Barker,
 
 407 U.S. at 532, 92 S.Ct. 2182).
 

 “The United States Supreme Court in
 
 Doggett
 
 used three hypothetical cases to demonstrate the accused’s burden under the fourth
 
 Barker
 
 factor. 505 U.S. at 656-57, 112 S.Ct. 2686.
 
 See Robinson v. Whitley,
 
 2 F.3d 562, 570 (5th Cir.1993) (discussing
 
 Doggett).
 
 The accused’s burden ‘of proof in each situation varies inversely with the [State]’s degree of culpability for the delay.’
 
 Robinson,
 
 2 F.3d at 570 (citing
 
 Doggett,
 
 505 U.S. at 656, 112 S.Ct. 2686). In the first scenario, where the state pursues the accused ‘with reasonable diligence,’ the delay— however long — generally is excused unless the accused demonstrates ‘specific prejudice to his defense.’
 
 Doggett,
 
 505 U.S. at 656, 112 S.Ct. 2686. Thus, when the state acts with reasonable diligence in bringing the defendant to trial, the defendant has the burden of proving prejudice caused by the delay.”
 

 In this case, as set forth above, the State acted with reasonable diligence in bringing Brown to trial. Therefore, Brown has the burden of proving that the delay prejudiced him. In his brief to this court, he makes only general allegations that he suffered prejudice because he spent almost seven years in jail awaiting trial with “the anxiety and concern of facing capital charges”; that the fact that he was incarcerated hindered his ability to gather evidence, contact witnesses, and prepare his defense; that prejudice should be presumed because the delay was allegedly the result of the State’s negligence; and that the delay prejudiced him because it allowed the State to present T.S. as a witness, that the memory of a child witness is susceptible to the passage of time that T.S. spent much of that time in the care of Smith and his wife, and that the State met with T.S. on numerous occasions to prepare her to be a witness. However, Brown’s assertions consist of bare allegations. Therefore, we conclude that he did not demonstrate specific, actual prejudice to his defense because of the delay.
 

 Moreover, even if we were to conclude that Brown was entitled to a presumption of prejudice due to the sheer length of the delay, the majority of that delay was either neutral delay or caused by his own actions,
 
 *1016
 
 as set forth above. Also, there is not any indication that the delay actually hampered his defense in any way.
 
 See Walker,
 
 supra.
 

 After weighing the
 
 Barker
 
 factors, the record before us does not support a finding that Brown was denied his right to a speedy trial. Accordingly, we do not find that there was any error, much less plain error, in this regard.
 

 IV.
 

 Brown’s fourth argument is that the prosecutor engaged in misconduct during his trial. Because he did not object at trial to the comments about which he now complains, we review them for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P. As the Alabama Supreme Court stated in
 
 Ex parte Windsor,
 
 683 So.2d 1042, 1061 (Ala.1996):
 

 “ ‘ “While this failure to object does not preclude review in a capital case,
 
 it does weigh against any claim of prejudice.” Ex parte Kennedy,
 
 472 So.2d [1106,] at 1111 [ (Ala.1985) ] (emphasis in original). “This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.”
 
 Johnson v. Wainwright,
 
 778 F.2d 628, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).’ ”
 

 Initially, we note that the trial court instructed the jury that the evidence in this case came from the testimony of the witnesses and the exhibits that were admitted into evidence. We presume that the jury followed the trial court’s instructions.
 
 See Taylor v. State,
 
 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995). In judging a prosecutor’s closing argument, the standard is whether the argument “ ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ”
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting
 
 Donnelly v. DeChristoforo,
 
 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).
 

 “In reviewing allegedly improper prose-cutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.
 
 Whitlow v. State,
 
 509 So.2d 252, 256 (Ala.Cr.App.1987);
 
 Wysinger v. State,
 
 448 So.2d 435, 438 (Ala.Cr.App.1983);
 
 Carpenter v. State,
 
 404 So.2d 89, 97 (Ala.Cr.App.1980),
 
 cert. denied
 
 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.
 
 Orr v. State,
 
 462 So.2d 1013, 1016 (Ala.Cr.App.1984);
 
 Sanders v. State,
 
 426 So.2d 497, 509 (Ala.Cr.App.1982).”
 

 Bankhead v. State,
 
 585 So.2d 97, 106-07 (Ala.Crim.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). Finally,
 

 “ ‘[djuring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’
 
 Rutledge v. State,
 
 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the tidal court in regulating the arguments of
 
 *1017
 
 counsel.
 
 Racine v. State,
 
 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’
 
 Hooks v. State,
 
 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting
 
 Barnett v. State,
 
 52 Ala.App. 260, 264, 291 So.2d 353, 357 (Ala.Cr.App.1974)), and the remarks must be evaluated in the context of the whole trial.
 
 Duren v. State,
 
 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). ‘In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.’
 
 Mitchell v. State,
 
 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). ‘To justify reversal because of an attorney’s argument to the jury, this court must conclude, that substantial prejudice has resulted.’
 
 Twilley v. State,
 
 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).”
 

 Coral v. State,
 
 628 So.2d 954, 985 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).
 

 A.
 

 Initially, Brown contends that, during his guilt-phase closing arguments, the prosecutor improperly asserted his personal opinion as to his guilt. During his rebuttal closing argument, the prosecutor stated:
 

 “So, I submit to you in count three is the exact same way. A lesser included of intentional murder of Cherea Jemi-son, you’ve got to believe that he did not rob her, he just killed her intentionally. And then if you take the intentional murder out, you’ve got just robbery. And then it’s just a robbery. It’s not just a robbery. Think about it. Common sense you can use is that it’s an intentional act without question. They’re intentionally killed. And it is a robbery without question. And it is two or more persons pursuant to one conduct without question. The only question you’ve got is you’ve got to get back here and determine beyond a reasonable doubt is did he do it? Did he do it? Because we’ve proven all the elements of the offense.
 
 I submit to you, we proved he did it. But that’s the question for you. I don’t get to go back there with you. My vote was cast a long time ago when I charged him with what he did.”
 

 (R. 970-71) (emphasis added).
 

 “ ‘While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence.’ ”
 

 Allen v. State,
 
 659 So.2d 135, 139 (Ala.Crim.App.1994) (quoting
 
 Sams v. State,
 
 506 So.2d 1027, 1029 (Ala.1986)).
 

 “ ‘A prosecutor as well as defense counsel has a right to present his impressions from the evidence,’ and ‘[h]e may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way.’
 
 Watson v. State,
 
 398 So.2d 320, 328 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).”
 

 Henderson v. State,
 
 584 So.2d 841, 856-57 (Ala.Crim.App.).
 

 “ ‘ “ ‘[T]he rule on which the weight of authority is in agreement is that it is improper for the prosecuting
 
 *1018
 
 attorney ... to express his personal opinion or belief in guilt of accused [so] as to permit an inference by the jury that such opinion or belief is based on reasons or information outside the evidence, but that it is not improper for him to argue or to express his opinion that accused is guilty, where he states, or it is apparent, that such opinion is based solely on the evidence.’ 23A C.J.S.
 
 Criminal Law
 
 § 1104, p. 194-95 (1961). See
 
 Crenshaw v. State,
 
 153 Ala. 5, 7, 45 So. 631, 632 (1908) (prosecutor argued to the effect that the evidence showed a clear case);
 
 Cranmore v. State,
 
 41 Ala.App. 276, 279, 129 So.2d 121, 123 (1961) (prosecutor’s statement, ‘I never did ask you to convict a man I believe to be innocent’ found to be ‘a mere expression of opinion by the solicitor that the defendant was guilty, and ... not a cause for reversal’);
 
 Handley v. State,
 
 214 Ala. 172, 175, 106 So. 692, 695 (1925) (argument, ‘She is a murderer; she is a murderer. She is not some one who has committed some of the lower offenses of homicide’ did ‘not transcend the bounds of legitimate argument’);
 
 Gardner v. State,
 
 17 Ala.App. 589, 590-91, 87 So. 885, 886, cert. denied, 205 Ala. 60, 87 So. 888 (1920) (prosecutor’s argument that the defendant ‘is a pickpocket’ in prosecution for grand larceny ‘was the expression of an opinion’ by the prosecutor, ‘and from the state’s contention was supported by one phase of the evidence.’ Presiding Judge Bricken dissented, arguing that ‘it did not lie in the mouth of the solicitor to decide these vital questions.’);
 
 McColston v. State,
 
 20 Ala.App. 591, 593, 104 So. 347, 348-49 (1925) (prosecutor’s argument, ‘He is guilty of the crime of highway robbery,’ should be refrained from but did not constitute error);
 
 Dunn v. State,
 
 19 Ala.App. 576, 577, 99 So. 154, 155 (1924) (prosecutor’s comment, ‘I tell you that this defendant is guilty,’ was merely an argument of the inference drawn by the solicitor and was not improper);
 
 Griggs v. State,
 
 21 Ala.App. 530, 531, 109 So. 611 (1926) (prosecutor stated that from the evidence he believed the defendant was guilty, and that, if he did not believe the defendant was guilty, he would not ask the jury to convict him. Held: The opinion was based upon the evidence. “Where this is the case, such expression of opinion will not be sufficient upon which to predicate a reversal.’);
 
 Tucker v. State,
 
 28 Ala.App. 492, 494, 188 So. 276, 277 (1939) (prosecutor’s statement, T believe he [defendant] is guilty* was a ‘mere expression of opinion by the solicitor’ and not improper remark);
 
 Gilbert v. State,
 
 19 Ala.App. 104, 106-07, 95 So. 502, 504 (1923) (prosecutor’s closing argument, ‘He is guilty as hell itself under this testimony, and you know it’ though not approved was ‘but the mere expression of counsel made in argument’).”
 

 “
 
 ‘Galloway v. State,
 
 484 So.2d 1199, 1201 (Ala.Cr.App.1986).’
 

 “Hunt v. State,
 
 659 So.2d 933, 940-42 (Ala.Crim.App.1994) (holding that the following comments by the prosecutor were not error: that he felt that the evidence presented was ‘ “overwhelming,”’ that ‘“at the conclusion of this trial ... you will agree with the State of Alabama that the defendant is guilty of capital murder,” ’ and that ‘ “if this isn’t capital murder, then there has never
 
 *1019
 
 been capital murder in Walker County”’), aff'd, 659 So.2d 960 (Ala.1995).”
 

 McGowan v. State,
 
 990 So.2d 931, 971-72 (Ala.Crim.App.2003).
 

 After reviewing the prosecutors comments in context, we conclude that they were simply permissible comments on Brown’s guilt that were based on the evidence. Also, the prosecutor did not improperly encourage the jury to convict Brown based on reasons or information outside the evidence. Accordingly, we do not find that there was any plain error in this regard.
 

 B.
 

 Brown also contends that the prosecutor made comments that were not supported by the evidence and that “were intended solely to provoke a visceral reaction from the jury.” (Brown’s brief at p. 72.) During the State’s guilt-phase rebuttal closing argument, the following occurred:
 

 “And he talks about 7 years since this happened. Yes, it has been years. Oh, and how can she remember that after 7 years? Let me tell you something: How do you think she’s ever going to forget it? I wish she could. I wish a four-year-old girl’s last image of her mother was not lying in that hall with that (pointing) killer standing over her. Do you think it’s — do you think it’s unusual she can’t remember going to Cleveland? Do you think that’s unusual? I know people that remember minute details about the birth of their first child, color of their skin, how their head looked, how their hands. I bet they don’t know what they were doing 30 minutes later. But they remember the look of that baby. Just like she remembers the look of her mother with
 
 that thug
 
 right there (pointing) standing over her. How could she not remember that? Oh, she couldn’t recall that. But she did.”
 

 (R. 959-60) (emphasis added).
 

 “And something [defense counsel] said struck me right off the bat. He said Manuel Smith heard from his wife he had never been arrested for domestic violence and abusing her. Well, he has now.
 
 It’s just a shame he wasn’t arrested for slapping her. It’s [a shame] he wasn’t arrested for kicking her. When he gets arrested for it, he’s killed her.”
 

 (R. 958) (emphasis added).
 

 “But I want you to think about this — I want you to think. I want to talk about it just again. I said it. The last image for that child is seeing her mother there. But we are in the light of day now in a courtroom in a court of law for him. Right there. I want you because you believe he’s guilty beyond a reasonable doubt and to a moral certainty of each and every element, I want you to give him the last image in the light of day for Dotty and Cherea Jemison, give him the last image of hearing the words: ‘We the jury find the defendant guilty of capital murder of two or more persons.’
 
 Give him the last image of saying: ‘We the jury find him guilty of murder of Dotty Jemison during a robbery. We the jury find him guilty of murder during a robbery of Cherea Jemison.’
 
 Make that the last image he hears of Dotty and Cherea Jemison. Because the last thing that he gave this little girl is to see [her] mother standing there— or see her lying there with her Daddy— or excuse me, that was Wakilii standing over her, it wasn’t Daddy. I thank you.”
 

 (R. 971-72) (emphasis added). Subsequently, during the prosecutor’s penalty-phase closing argument, the following occurred:
 

 
 *1020
 
 “And I tell you what, whether Rosenzweig believes in the death penalty or Goff or anybody else, we know one thing beyond a reasonable doubt, there is one person in this courtroom that does, and there (pointing) he sits. He believes in it. Because on March 9th and 10th, he acted as judge, jury, and executioner of Dotty Jemison and Cherea Jemison. And they didn’t get the benefit of the light of day in the courtroom in the State of Alabama to have a sentence hearing to put on evidence to him why they should not be punished for death by death. He believes in it. He believes in carrying it out. But he doesn’t believe in the proposition that people deserve a right to have somebody beg.
 
 I bet you there was some begging going on. I bet you there was. And I ask you to give his sympathy and the result of their begging the same way he gave it to Dotty Jemison and Cherea Jemison and sentence him the death or recommend the sentence of death as the law allows based on the proof to you.”
 

 (R. 1225-26) (emphasis added).
 

 Some of the prosecutor’s statements were reasonable inferences based on the evidence presented at trial. However, even if the prosecutor did misstate or mis-charaeterize the evidence presented at trial, his statements were not of such a nature that they “ ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ”
 
 Darden,
 
 supra. Also, the trial court repeatedly instructed the jury that the evidence in this case came from the testimony from the witness stand and from the exhibits introduced into evidence. We presume that the jury followed the trial court’s instructions.
 
 See Taylor,
 
 supra.
 

 Additionally, after reviewing the comments in the context of the entire proceedings, we conclude that they were not of such a nature as to inflame the passions of the jury. Also, we view the statements of counsel in closing argument as having been made in the heat of debate, and we note that such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.
 
 See Orr v. State,
 
 462 So.2d 1013 (Ala.Crim.App.1984).
 

 For these reasons, we do not find any plain error in this regard.
 

 C.
 

 Brown further contends that the State improperly created a negative connotation for his name and that the use of that label was misconduct. Specifically, he asserts that “[t]he State made use of [T.S.’s] testimony to create the label ‘Wakilii’ for [him], and to imbue that label with particularly disfavorable meaning” and that the “[t]he State’s use of this label was designed to manipulate the emotions of the jury, and was impermissible.” (Brown’s brief at p. 75.) Because Brown did not object at trial to the comment about which he now complains, we review it for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 During the State’s guilt-phase closing argument, the following occurred:
 

 “[T.S.] second witness. You can’t forget her. The defendant’s daughter. She was four years old when her mother was killed. Four years old when her grandmother was murdered. Eleven years old when she came in here and had the courage to tell you all about the last time she saw her mother. She told you something important. She said T called him Wakilii when they were fus-sin, and I called him dad other times.’
 
 She called him Wakilii this night. Did you notice that? She called him Waki-lii there in the hallway.”
 

 (R. 922) (emphasis added).
 

 When the State was questioning T.S. about who lived in her home with her at
 
 *1021
 
 the time of the murders, the following occurred:
 

 “[PROSECUTOR:] Okay. Was there anybody else? Your two brothers, your mom, and your grandma, and your Dad — did you call Wakilii your Dad?
 

 “[T.S.:] When he wasn’t mean.
 

 “THE COURT: I’m sorry.
 

 “[PROSECUTOR:] Tell me that again.
 

 “[T.S.:] When he wasn’t fussing.
 

 “[PROSECUTOR:] Okay. So, when he wasn’t fussing, you called him your dad?
 

 “[T.S.:] Yes, ma’am.
 

 “[PROSECUTOR:] What did you call him when he was fussing?
 

 “[T.S.:] Wakilii.
 

 “[PROSECUTOR:] So, is it okay with you if we call him Wakilii today?
 

 “[T.S.:] Yes, sir [sic].”
 

 (R. 377-78.) Subsequently, T.S. testified that the last time she saw her mother, she was standing at the door of her bedroom; that her mother was in the hallway fussing; and that her mother was fussing with “Wakilii.” (R. 379.) After reviewing the prosecutor’s statement in context, we find that it was a permissible comment on the evidence presented during the trial. Also, the statement was not of such nature as to inflame the passions of the jury. Therefore, we do not find that there was any plain error in this regard.
 

 D.
 

 Finally, Brown contends that “the cumulative impact of the State’s misconduct during trial necessitates reversal.” (Brown’s brief at p. 76.) We have considered each of the allegations of prosecutorial misconduct individually, and we have not found that any of those allegations of error require reversal. We have also considered the allegations of prosecutorial misconduct cumulatively, and we do not find that “the accumulated errors have ‘probably injuriously affected [Brown’s] substantial rights.’ ”
 
 Ex parte Woods,
 
 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.). Therefore, Brown’s argument is without merit.
 

 V.
 

 Brown’s fifth argument is that we should remand this case to the trial court for a hearing pursuant to
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, he contends that the record raises an inference that the State discriminated on the basis of race and gender.
 

 “In
 
 Batson
 
 the United States Supreme Court held that black veniremembers could not be struck from a black defendant’s jury because of their race. In
 
 Powers v. Ohio,
 
 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the court extended its decision in
 
 Batson
 
 to apply also to white defendants.... The United States Supreme Court in
 
 Georgia v. McCollum,
 
 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), held that the protections of
 
 Batson
 
 were also available to defense counsel in criminal trials. The Alabama Supreme Court has held that the protections of
 
 Batson
 
 apply to the striking of white prospective jurors.
 
 White Consolidated Industries, Inc. v. American Liberty Insurance, Co.,
 
 617 So.2d 657 (Ala.1993).”
 

 Grimsley v. State,
 
 678 So.2d 1194, 1195 (Ala.Crim.App.1995). Brown did not raise a
 
 Batson
 
 objection at trial. Therefore, we review his argument only for plain error.
 
 See
 
 Rule 45, Ala. R.App. P.
 

 Plain error is
 

 “error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial pro
 
 *1022
 
 ceedings.
 
 Ex parte Taylor,
 
 666 So.2d 73 (Ala.1995). The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.
 
 Taylor.”
 

 Ex parte Trawick,
 
 698 So.2d 162, 167 (Ala.1997). “To find plain error in the context of a
 
 Batson
 
 or
 
 J.E.B. [v. Alabama,
 
 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994),] violation, the record must supply an inference that the prosecutor was ‘engaged in the practice of purposeful discrimination.’
 
 Ex parte Watkins,
 
 509 So.2d 1074,1076 (Ala.1987).”
 
 Blackmon v. State,
 
 7 So.3d 397, 425 (Ala.Crim.App.2005).
 

 “The burden of persuasion is initially on the party alleging discriminatory use of a peremptory challenge to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider ‘all relevant circumstances’ which could lead to an inference of discrimination. See
 
 Batson,
 
 476 U.S. at 93, 106 S.Ct. at 1721, citing
 
 Washington v. Davis,
 
 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
 

 “1. Evidence that the ‘jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.’
 
 [People v.] Wheeler,
 
 22 Cal.3d [258,] at 280, 583 P.2d [748,] at 764, 148 Cal.Rptr. [890,] at 905 [ (1978) ]. For instance ‘it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,’
 
 Wheeler,
 
 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
 

 “2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors.
 
 Batson,
 
 476 U.S. at 97, 106 S.Ct. at 1723.
 

 “3. The past conduct of the offending attorney in using peremptory challenges to strike all blacks from the jury venire.
 
 Swain [v. Alabama,
 
 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)].
 

 “4. The type and manner of the offending attorney’s questions and statements during voir dire, including nothing more than desultory voir dire.
 
 Batson,
 
 476 U.S. at 97, 106 S.Ct. at 1723;
 
 Wheeler,
 
 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
 

 “5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions.
 
 Slappy v. State,
 
 503 So.2d 350, 355 (Fla.Dist.Ct.App.1987);
 
 People v. Turner,
 
 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986);
 
 People v. Wheeler,
 
 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 [905] (1978).”
 

 “6. Disparate treatment of members of the jury venire with the same characteristics; or who answer a question in the same or similar manner; e.g., in
 
 Slappy,
 
 a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged.
 
 Slappy,
 
 503 So.2d at 352 and 355.
 

 “7. Disparate examination of members of the venire; e.g., in
 
 Slappy,
 
 a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but
 
 *1023
 
 not to white jurors.
 
 Slappy,
 
 503 So.2d at 355.
 

 “8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury.
 
 Batson,
 
 476 U.S. at 93, 106 S.Ct. at 1721;
 
 Washington v. Davis,
 
 426 U.S. [229,] at 242, 96 S.Ct. [2040,] 2049 (1976) ].
 

 “9. The offending party used peremptory challenges to dismiss all or most black jurors, but did not use all of his peremptory challenges. See
 
 Slappy,
 
 503 So.2d at 354,
 
 Turner,
 
 supra.”
 

 Ex parte Branch,
 
 526 So.2d 609, 622 (Ala.1987).
 

 First, Brown argues that there was “a stark statistical disparity in the prosecution’s use of its strikes.” (Brown’s brief at p. 81.) After excuses and challenges for cause, 44 veniremembers remained. Of those, 9 were white males, 20 were white females, 10 were black males, and 5 were black females. Thus, 29 were white and 15 were black; 25 were female and 19 were male. Each party had sixteen peremptory challenges. The State struck 3 white males, 3 white females, 7 black males, and 3 black females. Thus, the State struck 6 white people and 10 black people; 10 males and 6 females. The defense struck 4 white males, 11 white females, 1 black female, and 0 black males. Thus, the defense struck 15 white people and 1 black person; 4 males and 12 females. Finally, the jury consisted of 2 white males, 6 white females, 3 black males, and 1 one black female. There were also 2 white female alternates. Thus, the jury consisted of 8 white people and 4 black people, 5 males and 7 females, with 2 white female alternates.
 

 An examination of the percentages of each of the categories set forth above shows that the composition of the jury is substantially similar to the composition of the venire. We also note that the defense used its first 12 strikes against white people and that it struck 4 white males and 11 white females, thus using 15 of its 16 peremptory challenges to remove white veniremembers. After examining the numbers carefully, including the defense’s strikes, we conclude that they do not raise an inference of discrimination by the State on the basis of either race or gender.
 

 Next, Brown argues that the State engaged in disparate treatment of venire-members who had the same characteristics or who answered questions in a similar manner. Specifically, he contends that Veniremembers 72, 167, 190, 212, 216, 219, and 225 “answered
 
 voir dire
 
 questions in a similar manner to a number of white females who were
 
 not
 
 struck by the prosecution and who ultimately served on the jury.” (Brown’s brief at p. 83.) Brown asserts that the only non-discriminatory reasons for striking those veniremembers were that the veniremembers knew one or more of the witnesses or the venire-members or their family members had been arrested or charged with a crime in Talladega County. He further asserts that three white females who served on the jury — Veniremembers 63, 146, and 162 — and one white female who was struck last by the State and served as an alternate — Veniremember 129 — also indicated that they knew one or more witnesses or had family members who had been arrested in Talladega County.
 

 We have carefully examined the responses of all of the veniremembers, with particular attention to the veniremembers Brown alleges were similar but treated disparately, and we conclude that the record does not support his assertion that the State engaged in disparate treatment with regard to the above-referenced venire-
 
 *1024
 
 members. First, the record shows that all veniremembers who had family members who had problems with drugs were struck by either the State or the defense. During the voir dire proceedings, Venire-members 72, 212, and 190 indicated that they had family members who had problems with drugs or had been arrested on drug-related charges. Second, the record shows that all veniremembers who had actually been arrested for or convicted of a crime were struck. During the voir dire proceedings, Veniremembers 129, 216, 219, and 225 indicated that they had previously been arrested. Third, all veniremembers whose children had previously been arrested for or convicted of a crime were struck. During the voir dire proceedings, Veniremember 167 indicated that his daughter had previously been arrested for a crime. In contrast, Veniremembers 63, 146, 162, and 205 did not share any of these characteristics. Finally, there may be other differences that are not reflected by the written transcript but that the prosecutor observed and considered in striking the various veniremembers. However, we are not privy to those differences because Brown did not make a
 
 Bat-son
 
 objection and, therefore, the trial court did not conduct a
 
 Batson
 
 hearing at trial.
 

 Finally, Brown argues that the State engaged in disparate questioning. Specifically, he contends that, “[ajfter asking 12 veniremembers about arrests and criminal charges, the prosecutor suppressed a white female’s effort to answer the question, insisting that she had answered the same question earlier and instructing her not to respond.” (Brown’s brief at p. 84.) Although the record does not show that the veniremember had actually answered that precise question earlier, the venire-member had responded about family members who were involved in law enforcement. Rather than discriminating based on race or gender, it appears that the prosecutor was simply mistaken about the veniremembers’ previous responses.
 
 See Ex parte Brown,
 
 686 So.2d 409, 420 (Ala.1996) (holding that “[a] prosecutor can strike based on a mistaken belief, see
 
 Taylor v. State,
 
 666 So.2d 36, 42 (Ala.Cr.App.1994); therefore, it is logical that a prosecutor may also decide, based on a mistaken belief, not to strike a veniremember. Because the discrepancy in the way these two jurors were treated was adequately explained, we conclude that the strike of Juror 19 was race-neutral.”);
 
 Smith v. State,
 
 590 So.2d 388, 390 (Ala.Crim.App.1991) (holding that “[a] prosecutor may strike from mistake, as long as the assumptions involved are based on an honest belief and are racially neutral”).
 

 We have carefully reviewed the record in this case to determine whether there is an inference that the State engaged in purposeful discrimination against blacks and males as Brown alleges. For the reasons set forth above, Brown has not established that the State treated similarly situated veniremembers disparately, that there was a pattern of strikes by the State on the basis of race or gender, or that the State engaged in discriminatory questioning. Brown also has not alleged, much less established, that this prosecutor has a history of using peremptory challenges in a discriminatory fashion, that the venire-members the State struck shared only the characteristic of race or gender, that the State’s questions during voir dire were simply desultory or not meaningful, that the State engaged in disparate examination of veniremembers, or that the State used its challenges to dismiss all or most black or male veniremembers. Based on our review of the record and Brown’s arguments, we do not find that there is any inference of purposeful discrimination by the State in its exercise of its peremptory
 
 *1025
 
 challenges. Therefore, we do not find that there is any plain error in this regard.
 

 VI.
 

 Brown’s sixth argument is that trial court’s jury instructions violated Alabama law and the United States Constitution.
 

 A.
 

 Initially, Brown contends that the trial court’s instruction on reasonable doubt violated the principles of
 
 Cage v. Louisiana,
 
 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). However, he did not present this argument to the trial court. Therefore, we review it for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 In
 
 Knotts v. State,
 
 686 So.2d 431 (Ala.Crim.App.), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), we held:
 

 “The Due Process Clause of the Fourteenth Amendment ‘protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.’
 
 In re Winship,
 
 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In
 
 Cage v. Louisiana,
 
 the United States Supreme Court found that a jury charge that defined ‘reasonable doubt’ by using the phrases ‘grave uncertainty,’ ‘actual substantial doubt,’ and ‘moral certainty’ could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. Subsequently, the Court ‘made it clear that the proper inquiry is not whether the instruction “could have” been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury
 
 did
 
 so apply it.’
 
 Victor v. Nebraska,
 
 511 U.S. 1, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (quoting
 
 Estelle v. McGuire,
 
 502 U.S. 62 72-73 and n. 4, 112 S.Ct. 475 482, and n. 4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow the conviction based on proof insufficient to meet the
 
 Winship
 
 reasonable doubt standard.
 
 Victor v. Nebraska; Ex parte Kirby,
 
 643 So.2d 587 (Ala.), cert. denied, [513] U.S. [1023,] 115 S.Ct. 591, 130 L.Ed.2d 504 (1994);
 
 Cox v. State,
 
 660 So.2d 233 (Ala.Cr.App.1994).
 

 “In reviewing the reasonable doubt instruction, we do so in the context of the charge as a whole.
 
 Victor v. Nebraska; Baker v. United States,
 
 412 F.2d 1069 (5th Cir.1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970);
 
 Williams v. State,
 
 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of ‘reasonable doubt’ in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal.
 
 Victor v. Nebraska; Holland v. United States,
 
 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).”
 

 686 So.2d at 459. “ ‘Use of some but not all of the terminology found offensive in
 
 Cage
 
 does not automatically constitute reversible error.’ ”
 
 Taylor v. State,
 
 666 So.2d 36, 56 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995) (quoting
 
 Dobyne v. State,
 
 672 So.2d 1319, 1343 (Ala.Crim.App.1994), aff'd, 672 So.2d 1354 (Ala.1995)). Further, we have previously held that the statement that a reasonable doubt is a doubt for which a reason can be given does not violate
 
 Cage
 
 and does not improperly lessen the State’s burden of proof.
 
 See Burgess v. State,
 
 827 So.2d 134 (Ala.Crim.App.1998), aff'd, 827 So.2d 193 (Ala.2000);
 
 Ex parte McWilliams,
 
 640 So.2d 1015 (Ala.1993), aff'd, 666 So.2d 90 (Ala.1995);
 
 *1026
 

 McMillian v. State,
 
 594 So.2d 1253 (Ala.Crim.App.1991).
 

 Although the trial court used some of the language found objectionable in
 
 Cage,
 
 taken as a whole, the trial court’s instructions in this case properly conveyed the concept of reasonable doubt to the jury and did not lessen the State’s burden of proof. Also, there is not a reasonable likelihood that the jury applied the instructions in a manner that would violate Brown’s constitutional rights. Therefore, we do not find that there was any plain error in this regard.
 

 B.
 

 Brown also contends that the trial court erred when it did not instruct the jury that a robbery committed as a mere afterthought to the murders would not support convictions for the capital offense of robbery-murder. However, he did not present this argument to the trial court. Therefore, we review it for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 We addressed a similar argument in
 
 Reeves v. State,
 
 807 So.2d 18, 42-44 (Ala.Crim.App.2000), as follows:
 

 “The appellant also contends that the trial court erred in refusing to instruct the jury on ‘robbery [as an] afterthought.’ At trial, the appellant requested several instructions relating to the general principle of law that robbery as a mere afterthought and unrelated to the murder cannot sustain a conviction for capital murder. However, the trial court refused to give the instructions requested by the appellant, finding that it was sufficient to give jurors the pattern jury charge on capital murder because the pattern charge adequately conveyed the principle that it was necessary for the murder to have occurred ‘during’ a robbery in order to sustain a conviction for capital murder.
 

 “In
 
 Freeman v. State,
 
 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000), we stated the following regarding robbery as an ‘afterthought’:
 

 “ ‘ “The capital crime of the intentional killing of the victim during a robbery or an attempted robbery is a single offense beginning with the act of robbing or attempting to rob and culminating with the intentional killing of the victim. The offense consists of two elements, robbing and intentionally killing.
 
 Davis v. State,
 
 536 So.2d 110 (Ala.Crim.App.1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989);
 
 Magwood v. State,
 
 494 So.2d 124 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
 

 “ ‘ “ ‘As the Alabama Supreme Court held in
 
 Cobern v. State,
 
 273 Ala. 547, 142 So.2d 869 (1962), “the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.”
 
 Clements v. State,
 
 370 So.2d 708, 713 (Ala.Crim.App.1978), aff'd in pertinent part, 370 So.2d 723 (Ala.1979);
 
 Clark v. State,
 
 451 So.2d 368, 372 (Ala.Crim.App.1984). To sustain any other position “would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.”
 
 Thomas v. State,
 
 460 So.2d 207, 212, (Ala.Crim.App.1983), aff'd, 460 So.2d 216 (Ala.1984).
 

 “ ‘ “ ‘Although a robbeiy committed as a “mere afterthought” and
 
 *1027
 
 unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see
 
 Bufford v. State,
 
 [382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980)];
 
 O’Pry v. State,
 
 [642 S.W.2d 748 (Tex.Cr.App.1981) ], the question of a defendant’s intent at the time of the commission of the crime is usually an issue for the jury to resolve
 
 Crowe v. State,
 
 435 So.2d 1371, 1379 (Ala.Crim.App.1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim’s property and fled.
 
 Cobern v. State,
 
 273 Ala. [at] 550, 142 So.2d [at] 871 (1962). The defendant’s intent to rob the victim can be inferred where “the intervening time, if any, between the killing and robbery was part of a continuous chain of events.”
 
 Thomas v. State,
 
 460 So.2d at 212.... See also
 
 Cobern v. State; Crowe v. State; Bufford v. State; Clements v. State.’
 
 ”
 

 “
 
 ‘Bush v. State,
 
 695 So.2d 70, 118-19 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting
 
 Hallford v. State,
 
 548 So.2d 526, 534-35 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), quoting in turn
 
 Connolly v. State,
 
 500 So.2d 57, 63 (Ala.Crim.App.1985), aff'd, 500 So.2d 68 (Ala.1986).’
 

 “776 So.2d at 190-91. The Alabama Supreme Court has stated that ‘“[ejven had the [defendant] killed the victim for some purpose unrelated to the theft, the taking of property from the victim after the murder constitutes robbery, as the murder and the subsequent taking of the property formed a continuous chain of events.” ’
 
 Ex parte Roberts,
 
 735 So.2d 1270, 1277 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999), quoting
 
 Johnson v. State,
 
 479 So.2d 1377, 1380 (Ala.Crim.App.1985), and citing
 
 Clark v. State,
 
 451 So.2d 368 (Ala.Crim.App.), cert. denied, 451 So.2d 368 (Ala.[Crim.App.]1984).
 

 “Here, the trial court properly instructed the jury that in order to convict the appellant of capital murder, the State had to prove that the murder was committed ‘during the robbery.’ (R. 1094.) The trial court defined ‘during the robbery’ as ‘in the course of the commission of or in connection with the commission of the robbery.’ (R. 1094.) With these instructions, the trial court adequately conveyed to the jury the facts under which it could, and could not, find the appellant guilty of capital murder.
 

 “As we stated in
 
 Woods v. State,
 
 789 So.2d 896 (Ala.Crim.App.1999):
 

 “ ‘Although this court has held that the taking of property as a mere afterthought to a murder will not support a capital murder conviction under § 13A-5-40(a)(2),
 
 Bufford v. State,
 
 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980), we have not held that the trial court must use the term “mere afterthought” in its jury instructions on robbery-murder. The trial court more than adequately instructed the jury that the robbery had to occur “during” the course of the murder.’
 

 “789 So.2d at 932. See also
 
 Roberts v. State,
 
 735 So.2d 1244 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999);
 
 Ex parte Windsor,
 
 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137
 
 *1028
 
 L.Ed.2d 545 (1997);
 
 Jenkins v. State,
 
 627 So.2d 1034 (Ala.Crim.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).”
 

 Similarly, in this case, with regard to Counts II and III, the trial court instructed the jury that the murders of Dotty and Cherea had to take place during the robbery. With regard to Count II, the trial court instructed the jury as follows:
 

 “You’ve heard the word ‘during’ used. When I said the law states intentional murder committed during a robbery in the first degree is capital murder. Now, during means in the course of or in connection with the commission of or in the immediate flight from the commission of the robbery in the first degree or attempt thereof.
 

 “Now, during, again necessarily implies some mental connection or some connection of purpose in the defendant’s mind. And the intent to rob and the intent to kill would have to coexist in the defendant’s mind in order for the capital offense to occur. In order for the killing to occur during the course of a robbery, it would not make any difference which was committed first. Whether the taking of property first or the killing was committed first. Nor would a minor lapse of time necessarily indicate that the purpose was not there. You have to look at the entirety of the circumstances and determine that the State has proved beyond a reasonable doubt that the defendant killed Dotty Jemison. And if so, that he also intended to rob Dotty Jemi-son or Cherea Jemison before you could find the defendant guilty of the capital offense of the murder of Dotty Jemison during robbery.”
 

 (R. 1001-02.) Finally, with regard to Count III, the trial court instructed the jury as follows:
 

 “You heard the word ‘during’ used when I said the law states that intentional murder committed during a robbery in the first degree is capital murder. Now, during means in the course of, or in connection with, or in immediate flight from the commission of a robbery in the first degree. Now, during, again necessarily implies some mental connection or some connection of purpose in the defendant’s mind. And the intent to rob and the intent to kill would have to coexist in the defendant’s mind in order for the capital offense to occur. In order for the killing to occur during the course of a robbery, it would not make any difference which was committed first, whether the taking of property was committed first or the killing was committed first. Nor would a minor lapse of time necessarily indicate that the purpose was not there. You have to look at the entirety of the circumstances and determine if the State has proved beyond a reasonable doubt that the defendant killed Cherea Jemison. And if so, that he also intended to rob Dotty Jemison or Cherea Jemison before you could find the defendant guilty of the capital offense of murder of Cherea Je-mison during robbery in the third degree.”
 

 (R. 1016-18.) Because the trial court adequately instructed the jury that the murders had to take place during a robbery and thoroughly instructed the jury on the term “during,” Brown’s argument is without merit. Accordingly, we do not find that there was any plain error in this regard.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 VII.
 

 Brown’s seventh argument is that the trial court erred when it did not consider numerous nonstatutory mitigating factors about which he presented evidence. Be
 
 *1029
 
 cause he raises this argument for the first time on appeal, we review it for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 “The [trial] court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance,”
 
 Calhoun v. State,
 
 932 So.2d 923, 975 (Ala.Crim.App.2005), even if that evidence is from an expert.
 

 “ ‘[A] factfinder is not bound by expert testimony “even if all of the witnesses are presented by only one side.” ’
 
 Ellis v. State,
 
 570 So.2d 744, 752 (Ala.Cr.App.1990). ‘In Alabama, opinion testimony of an expert witness is binding upon a jury only when such testimony concerns a subject which is exclusively within the knowledge of experts and the testimony is uncontroverted.’
 
 Jefferson County v. Sulzby,
 
 468 So.2d 112, 116 (Ala.1985). ‘An expert’s opinion, however, is not conclusive on the trial court, even though uncontroverted. See
 
 Kroger Co. v. Millsap,
 
 280 Ala. 531, 196 So.2d 380 (1967). Rather, a trial court must look to the entire evidence and its own observations in deciding factual issues.’
 
 Williams v. City of Northport,
 
 557 So.2d 1272, 1273 (Ala.Civ.App.1989), cert. denied, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990). ‘Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.’
 
 Harrell v. State,
 
 470 So.2d 1303, 1308 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).”
 

 Carroll v. State,
 
 599 So.2d 1253, 1272 (Ala.Crim.App.1992). “ ‘While
 
 Lockett [v. Ohio,
 
 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978),] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.’
 
 Bankhead v. State,
 
 585 So.2d 97, 108 (Ala.Cr.App.1989).”
 
 Ex parte Slaton,
 
 680 So.2d 909, 924 (Ala.1996). Finally, although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance.
 
 See Williams v. State,
 
 710 So.2d 1276 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997).
 

 In its “Consideration, Findings and Determination of Sentence as Required by Title 13A, Chapter 5, Section 47(b) of the 1975 Code of Alabama as Amended,” the trial court stated:
 

 “This Court has considered the aggravating and mitigating circumstances and the other factors allowed pursuant to the provisions of Title 13A, Chapter 5, Section 40, et seq., relative to sentence determination. Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the presentence investigation report and any evidence submitted in connection with it, the trial court will enter herein specific written findings concerning the existence or non-existence of each aggravating circumstance enumerated in Title 13A, Chapter 5, Section 49 of the 1975 Code of Alabama, as amended, each mitigating circumstance enumerated in Title 13A, Chapter 5, Section 51 of the 1975 Code of Alabama, as amended, and any additional mitigating circumstances offered pursuant to Title 13A, Chapter 5, Section 52 of the 1975 Code of Alabama, as amended. In addition, the trial court will enter separate written findings of fact summarizing the crime and the Defendant’s participation in said crime.
 

 
 *1030
 
 “The Court has made a diligent search under the provisions of Title 13A, Chapter 5, Section 52, 1975 Code of Alabama, as amended, of the evidence offered by the Defendant, and the aspects of the presentence investigation report favorable to the Defendant on mitigation to determine if there is any aspect of the Defendant’s character or record, or any circumstance of the offense for which he has been convicted that would constitute mitigating circumstance, and finds that there is only one mitigating circumstance and that is the statutory mitigating circumstance found hereinabove. The Court finds that there are no non-statutory mitigating circumstances in this case.”
 

 (C.R. 82-86.) In its “Findings of Fact in Regard to Punishment Phase of the Trial,” the trial court stated:
 

 “At the punishment phase of the trial of the defendant, the State offered no additional evidence of aggravating circumstances as enumerated in Section 18A-5-49 of the Code of Alabama and relied upon the evidence presented during the guilt phase of the trial as to aggravating circumstances. The defendant offered evidence of mitigating circumstances as provided in Section 13A-5-51 of the Code of Alabama and 13A-5-52 of the Code of Alabama. John R. Goff, PhD a neuropsyehologist and Marianne G. Rosenzweig, PhD a forensic and clinical psychologist testified on behalf of the defendant. Further the defendant offered evidence of mitigating circumstances from his mother, Linda Brown and his Aunt, Jacqueline Heard.
 

 “The State of Alabama relied upon the evidence presented during the guilt phase of the trial as to aggravating circumstances. Evidence during the guilt phase and the sentencing phase of the trial provided evidence of one statutory mitigating circumstance as provided by law. The Court finds from the evidence presented during the guilt phase of the trial and the sentencing phase that there are no non-statutory mitigating circumstances.
 

 “At the conclusion of the sentence hearing, the jury returned a verdict recommending that the defendant be punished by death. The vote was 10 for death and two for life without parole.
 

 “The Court finds that the conduct of the defendant constituted a brutal, aggravated, merciless and intentional killing of Dotty Jemison and Cherea Jemison, and that the sentence recommendation of the jury as to the punishment of death to be imposed was fully justified by the facts and circumstances of the case and the aggravating circumstances outweighed the mitigating circumstance proved by the defendant.”
 

 (C.R. 98-99.) These excerpts show that the trial court complied with
 
 Lockett v. Ohio,
 
 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny in considering the mitigating evidence Brown presented during the penalty phase hearing. The fact that the trial court did not find the nonstatutory mitigating circumstances Brown offered does not establish that it did not properly consider such evidence. Rather, it simply establishes that the trial court exercised the discretion afforded to it in that regard. Therefore, we do not find that there was any error, much less plain error, in this regard.
 

 VIII.
 

 Brown’s eighth argument is that the trial court erred in denying his motion for a change of venue.
 

 “ ‘A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity
 
 *1031
 
 might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court’s ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion.
 
 Nelson v. State,
 
 440 So.2d 1130 (Ala.Cr.App.1983).’
 

 “Joiner v. State,
 
 651 So.2d 1155, 1156 (Ala.Cr.App.1994).”
 

 Clemons v. State,
 
 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998). “The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather,
 
 Ex parte Grayson[,
 
 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.”
 
 Slagle v. State,
 
 606 So.2d 193, 195 (Ala.Crim.App.1992). “ ‘Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.’ ”
 
 Whisenhant v. State,
 
 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989) (quoting
 
 Dannelly v. State,
 
 47 Ala.App. 363, 364, 254 So.2d 434, 435 (Ala.Crim.App.1971)).
 

 “In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated ‘actual prejudice’ against him on the part of the jurors; 2) when there is ‘presumed prejudice’ resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected.
 
 Sheppard v. Maxwell,
 
 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966);
 
 Rideau [v. Louisiana,
 
 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ];
 
 Estes v. Texas,
 
 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965);
 
 Ex parte Grayson,
 
 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985);
 
 Coleman v. Zant,
 
 708 F.2d 541 (11th Cir.1983).”
 

 Hunt v. State,
 
 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).
 

 A.
 

 We must first determine whether the pretrial publicity resulted in “presumptive prejudice.” For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held.
 
 See Coleman v. Kemp,
 
 778 F.2d 1487 (11th Cir.1985). Under this standard, a defendant carries an extremely heavy burden of proof.
 

 “Hunt relies on the ‘presumed prejudice’ standard announced in
 
 Rideau
 
 [v.
 
 Louisiana,
 
 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963),] and applied by the United States Supreme Court in
 
 Estes [v. Texas,
 
 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965),] and
 
 Sheppard [v. Maxwell,
 
 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in
 
 Coleman v. Kemp,
 
 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: ‘Prejudice is presumed from pretrial publicity when
 
 pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community
 
 where the trials were held.’ 778 F.2d at 1490 (emphasis added [in
 
 Hunt
 
 ]). See also
 
 Holladay v. State,
 
 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
 

 
 *1032
 
 “In determining whether the ‘presumed prejudice’ standard exists the trial court should look at ‘the totality of the surrounding facts.’
 
 Patton v. Yount,
 
 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984);
 
 Murphy v. Florida,
 
 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975);
 
 Irvin v. Dowd,
 
 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is ‘rarely5 applicable, and is reserved for only ‘extreme situations’.
 
 Coleman v. Kemp,
 
 778 F.2d at 1537. ‘In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.’
 
 Coleman v. Kemp,
 
 778 F.2d at 1490.
 

 “Hunt had the burden of showing that ‘prejudicial pretrial publicity’ saturated the community.
 
 Sheppard,
 
 supra. ‘[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.’
 
 Coleman v. Kemp,
 
 778 F.2d at 1537. ‘Prejudicial’ publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial process. ‘Publicity’ and ‘prejudice’ are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
 

 “... In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, ‘the appellant must show more than the fact “that a case generates even widespread publicity.” ’
 
 Oryang v. State,
 
 642 So.2d 979, 983 (Ala.Cr.App.1993), quoting,
 
 Thompson v. State,
 
 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
 

 “ ‘ “Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accu-sational or denunciatory statements, that a fair and impartial trial was impossible.
 
 Patton v. State,
 
 246 Ala. 639, 21 So.2d 844 [1945].” ’
 

 “Thompson,
 
 581 So.2d at 1233, quoting
 
 McLaren v. State,
 
 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).
 

 “A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so ‘pervasively saturated’ with prejudicial publicity so as to make the court proceedings nothing more than a ‘hollow formality.’
 
 Rideau,
 
 supra.”
 

 Hunt,
 
 642 So.2d at 1043-44. “To justify a presumption of prejudice under this standard, the publicity must be both extensive
 
 and
 
 sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.”
 
 United States v. Angiulo,
 
 897 F.2d 1169, 1181 (1st Cir.1990).
 

 In his written “Motion for Change of Place of Trial,” Brown made the following assertions:
 

 “1. There have been numerous newspaper articles in the local newspaper concerning the alleged facts of the case.
 

 “2. The children of one of the victims are in the custody of an individual who has recently been the subject of several articles in the local newspaper, the Daily Home.”
 

 (C.R. 215.) Although he alluded to articles, Brown did not attach or otherwise
 
 *1033
 
 present any specific media materials to the trial court. In his brief to this court, he references some specific articles about these case. However, “ ‘ “[t]his court is bound by the record and not by allegations or arguments in brief reciting matters not disclosed by the record.”
 
 Moore v. State,
 
 457 So.2d 981, 989 (Ala.Cr.App.1984), cert. denied, 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985).’
 
 Garnett v. State,
 
 555 So.2d 1153 (Ala.Crim.App.1989).”
 
 Similton v. State,
 
 672 So.2d 1363, 1366 (Ala.Crim.App.1995). Therefore, those articles are not properly before this court. Based on the record before us, we cannot conclude that media materials contained prejudicial information or that media attention inflamed or saturated the community so that there was an emotional tide against him. Therefore, the record does not support a conclusion that pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those “extreme situations” that warrant a presumption of prejudice because of pretrial publicity.
 

 B.
 

 We must also determine whether the jury was actually prejudiced against Brown.
 

 “The ‘actual prejudice’ standard is defined as follows:
 

 “‘To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty.
 
 Irvin v. Dowd,
 
 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and “render[ed] a verdict based on the evidence presented in court.”
 
 Irvin v. Dowd,
 
 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].’
 

 “Coleman v. Zant,
 
 708 F.2d at 544.”
 

 Hunt,
 
 642 So.2d at 1043.
 

 “Furthermore, in order for a defendant to show prejudice, the ‘ “proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.”
 
 Anderson v. State,
 
 362 So.2d 1296, 1299 (Ala.Crim.App.1978).’
 
 Ex parte Grayson,
 
 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).”
 

 Oryang v. State,
 
 642 So.2d 979, 983 (Ala.Crim.App.1993).
 

 Brown has not shown that any pretrial publicity actually prejudiced him. During the voir dire proceedings, the parties questioned the veniremembers in panels regarding their exposure to the media and/or knowledge about the case. Several of the veniremembers had heard, read, or seen or knew something about the case. However, very few indicated that they had already formed opinions about the case based on that information and that they could not be fair, and the trial court excused those veniremembers for cause. The remaining veniremembers indicated that they could set aside any information they had previously obtained about the case and make a decision based solely on the evidence presented during the trial. Accordingly, Brown has not shown that any of the jurors were actually prejudiced against him.
 

 For these reasons, Brown did not show that the jurors were either presumptively or actually prejudiced against him. Therefore, the trial court did not abuse its discretion in denying his motion for a change of venue.
 

 
 *1034
 
 IX.
 

 Brown’s ninth argument is that the trial court denied him the right to be tried by a jury of his peers when it “struck for cause a prospective juror who stated that she was opposed to the death penalty.” (Brown’s brief at p. 107.) However,
 

 “[i]n
 
 Lockhart v. McCree,
 
 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from ‘death qualification’ of juries in capital eases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama courts have consistently held likewise. See
 
 Williams v. State,
 
 556 So.2d 737 (Ala.Crim.App.1986),
 
 rev’d in part,
 
 556 So.2d 744 (Ala.1987);
 
 Edwards v. State,
 
 515 So.2d 86, 88 (Ala.Crim.App.1987);
 
 Martin v. State,
 
 494 So.2d 749 (Ala.Crim.App.1985).”
 

 Sockwell v. State,
 
 675 So.2d 4, 18 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995). In this case, the challenged venire-member specifically indicated that she would vote against the death penalty regardless of the evidence presented at trial. Because, as Brown acknowledges,
 
 Lock-hart
 
 held that the United States Constitution does not prohibit death qualification of jurors, the trial court properly removed the veniremember for case. Therefore, we do not find that there was any error in this regard.
 

 X.
 

 Brown’s tenth argument is that his death sentence violates the United States Supreme Court’s decision in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that any fact that increases a sentence above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. In
 
 Ring,
 
 the Court extended its holding in
 
 Apprendi
 
 to death penalty cases.
 

 A.
 

 First, Brown contends that Alabama’s capital sentencing scheme is unconstitutional because the jury does not make all of the findings that are necessary to support the imposition of the death penalty. However, in
 
 Ex parte Waldrop,
 
 859 So.2d 1181, 1187-88 (Ala.2002), the Alabama Supreme Court explained:
 

 “It is true that under Alabama law at least one statutory aggravating circumstance under Ala.Code 1975, § 13A-5-49, must exist in order for a defendant convicted of a capital offense to be sentenced to death. See Ala.Code 1975, § 13A-5-45(f) (‘Unless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole.’);
 
 Johnson v. State,
 
 823 So.2d 1, 52 (Ala.Crim.App.2001) (holding that in order to sentence a capital defendant to death, the sentenced ‘“must determine the existence of at least one of the aggravating circumstances listed in [Ala.Code 1975,] § 13A-5-49” ’ (quoting
 
 Ex parte Woodard,
 
 631 So.2d 1065, 1070 (Ala.Crim.App.1993))). Many capital offenses listed in Ala.Code 1975, § 13A-5-40, include conduct that clearly corresponds to certain aggravating circumstances found in § 13A-5-49:
 

 “ ‘For example, the capital offenses of intentional murder during a rape, § 13A-5-40(a)(3), intentional murder during a robbery, § 13A-5-40(a)(2), intentional murder during a burglary, § 13A-5-40(a)(4), and intentional murder during a kidnapping, § 13A-5-40(a)(l), parallel the aggravating
 
 *1035
 
 circumstance that “[t]he capital offense was committed while the defendant was engaged ... [in a] rape, robbery, burglary or kidnapping,” § 13A-5-49(4).’
 

 “Ex parte Woodard,
 
 631 So.2d at 1070-71 (alterations and omission in original).
 

 “Furthermore, when a defendant is found guilty of a capital offense, ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.’ Ala.Code 1975, § 13A-5-45(e); see also Ala.Code 1975, § 13A-5-50 (‘The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.’). This is known as ‘double-counting’ or ‘overlap,’ and Alabama courts ‘have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.’
 
 Ex parte Trawick,
 
 698 So.2d 162, 178 (Ala.1997); see also
 
 Coral v. State,
 
 628 So.2d 954, 965 (Ala.Crim.App.1992).
 

 “Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala. Code 1975, § 13A-5-49(4), was ‘proven beyond a reasonable doubt.’ Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Wal-drop’s case, the jury, and not the trial judge, determined the existence of the ‘aggravating circumstance necessary for imposition of the death penalty.’
 
 Ring,
 
 536 U.S. at 609, 122 S.Ct. at 2443. Therefore, the findings reflected in the jury’s verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all
 
 Ring
 
 and
 
 Apprendi
 
 require.”
 

 (Footnote omitted.)
 

 Because the jury convicted Brown of the capital offense of robbery-murder and of killing two or more people pursuant to one scheme or course of conduct, those statutory aggravating circumstances were proven beyond a reasonable doubt. Therefore, in this case, the jury, and not the judge, determined the existence of the “aggravating circumstance necessary for imposition of the death penalty.”
 
 Ring,
 
 536 U.S. at 609, 122 S.Ct. at 2443. Further, because the jury found the existence of at least one aggravating circumstance, Brown was exposed to or eligible for the death penalty, and “[t]he trial court’s subsequent determination that the murder [was] especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances.”
 
 Waldrop,
 
 859 So.2d at 1190. Accordingly, there was not a
 
 Ring
 
 violation in this case, and Brown’s arguments to the contrary are without merit.
 

 B.
 

 Brown also contends that
 
 Ex parte Waldrop
 
 was erroneously decided. However, § 12-3-16, Ala.Code 1975, provides:
 

 “The decisions of the Supreme Court shall govern the holdings and decisions of the courts of appeals, and the decisions and proceedings of such courts of
 
 *1036
 
 appeals shall be subject to the general superintendence and control of the Supreme Court as provided by Constitutional Amendment No. 328.”
 

 Because this court is bound by the decisions of the Alabama Supreme Court, we are not in a position to reverse that court’s decision in
 
 Ex parte Waldrop.
 

 C.
 

 Finally, Brown contends that “any issue committed to a jury — which, under
 
 Ring,
 
 must include any predicate facts that would allow imposition of a death sentence — must be resolved unanimously.” (Brown’s brief at p. 112.) In
 
 Sneed v. State,
 
 1 So.3d 104, 143 (Ala.Crim.App.2007), we addressed and rejected a similar argument as follows:
 

 “[T]he appellant asserts that his conviction violates
 
 Ring
 
 because the jury did not unanimously determine that statutory aggravating circumstances were present and that the aggravating circumstances outweighed the mitigating circumstances and because it was not required to specify which aggravating circumstances it found to exist.
 

 “In the guilt phase, the jury unanimously found beyond a reasonable doubt that the appellant committed a robbery during the course of committing a murder. ‘The jury’s unanimous finding of one aggravating circumstance is sufficient to satisfy
 
 Ring.’ Ex parte McNabb,
 
 887 So.2d 998, 1006 (Ala.2004). Also, ‘ “[t]he determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently,
 
 Ring
 
 and
 
 Apprendi
 
 do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.” ’
 
 Ex parte Hodges,
 
 856 So.2d 936, 943 (Ala.2003) (quoting
 
 Ex parte Waldrop,
 
 859 So.2d 1181, 1190 (Ala.2002)).”
 

 Therefore, Brown’s argument is without merit.
 

 XI.
 

 Brown’s eleventh argument is that “Alabama’s capital-sentencing statute fails to narrow the universe of defendants eligible for the death penalty.” (Brown’s brief at p. 114.) Specifically, he appears to contend that the trial court improperly treated robbery and the killing of two or more people pursuant to one scheme or course of conduct as both elements of the capital offenses and as aggravating circumstances. He also appears to contend that this “double counting” punishes him twice for the same offense. We addressed and rejected similar arguments in
 
 Jackson v. State,
 
 836 So.2d 915, 958-59 (Ala.Crim.App.1999), as follows:
 

 “ ‘The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstances or circumstances in determining sentence.’
 

 “Accordingly, under § 13A-5-50, Ala. Code 1975, a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49, Ala.Code 1975, as an aggravating circumstance. Further, this court has held that the use of an element of capital murder as an aggravating circumstance does not punish a defendant twice for the same offense.
 
 Burton v. State,
 
 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
 

 “ ‘This practice, known as “double counting” or “overlapping,” has been
 
 *1037
 
 upheld.
 
 Haney v. State,
 
 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993);
 
 Kuenzel [v. State,
 
 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)].
 

 “ ‘Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
 

 “ ‘ “The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5A9 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.”
 

 “ ‘Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense.
 
 Kuenzel,
 
 supra; see also
 
 Ex parte Kennedy,
 
 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
 

 “ ‘ “A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy.”
 

 “
 
 ‘Kuenzel,
 
 577 So.2d at 488, quoting
 
 Fortenberry v. State,
 
 545 So.2d 129, 142 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).’
 

 “Burton,
 
 651 So.2d at 657-58.”
 

 Hutcherson v. State,
 
 677 So.2d 1174, 1201 (Ala.Crim.App.1994), rev’d on other grounds, 677 So.2d 1205 (Ala.1996). Also, in
 
 Lowenfield v. Phelps,
 
 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the United States Supreme Court held:
 

 “Here, the ‘narrowing function’ was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that ‘the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.’ The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the. sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.”
 

 Therefore, Brown’s arguments are without merit.
 

 XII.
 

 Twelfth, Brown argues that the trial court erred when it instructed the jury, during its penalty phase instructions, that it “had no discretion as to aggravating circumstances because those circumstances had already been found beyond a reasonable doubt in the guilt phase.” (Brown’s brief at p. 115.) Although he acknowledges caselaw to the contrary, he still argues that “this instruction improperly divested the jury of its discretion at
 
 *1038
 
 sentencing.” (Brown’s brief at p. 116.) However, as we explained in Part XI, the practice of “double counting” has repeatedly been upheld. Therefore, the trial court’s instruction was not improper, and Brown’s argument to the contrary is without merit.
 

 XIII.
 

 Brown’s thirteenth argument is that that Alabama’s method of execution violates the United States Constitution and the Alabama Constitution. However, in
 
 Ex parte Belisle,
 
 11 So.3d 323, 339 (Ala.2008), the Alabama Supreme Court addressed the United States Supreme Court’s decision in
 
 Baze v. Rees,
 
 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), and “conclude^] that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.” Also, this court has previously rejected claims that Alabama’s method of execution violates the Alabama Constitution.
 
 See Dotch v. State,
 
 67 So.3d 936 (Ala.Crim.App.2010);
 
 Morris v. State,
 
 60 So.3d 326 (Ala.Crim.App.2010). Therefore, Brown’s argument is without merit.
 

 XIV.
 

 Brown’s fourteenth argument is that the cumulative effect of the above alleged errors entitles him to a new trial. We have considered each of the allegations of error individually, and we have not found that any of those allegations of error require reversal. We have also considered the allegations of error cumulatively, and we do not find that “the accumulated errors have ‘probably injuriously affected [Brown’s] substantial rights.’ ”
 
 Ex parte Woods,
 
 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.). Therefore, Brown’s argument is without merit.
 

 XV.
 

 Finally, pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of Brown’s convictions and sentence of death. Brown was indicted for and convicted of three counts of capital murder — one count because he committed the murders by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-40(a)(10), Ala.Code 1975, and two counts because he committed the murders during the course of a robbery,
 
 see
 
 § 13A-5-40(a)(2), Ala.Code 1975.
 

 The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
 

 The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved two aggravating circumstances — 1) Brown committed the capital offenses while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery,
 
 see
 
 § 13A-5^19(4), Ala.Code 1975, and 2) Brown intentionally caused the death of two or more people by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-49(9), Ala.Code 1975. The trial court found that one statutory mitigating circumstance existed — Brown did not have a significant history of prior criminal activity.
 
 See
 
 § 13A-5-5K1), Ala.Code 1975. The trial court did not find any nonstatuto-ry mitigating circumstances. The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced Brown to death. The record supports its decision, and we agree with its findings.
 

 Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of Brown’s sen
 
 *1039
 
 tence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
 

 As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Brown’s sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. Brown killed two people pursuant to one scheme or course of conduct and committed two murders during two robberies. Similar crimes are being punished by death throughout this state.
 
 See Gaddy v. State,
 
 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997);
 
 Brooks v. State,
 
 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997);
 
 Bush v. State,
 
 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997);
 
 Taylor v. State,
 
 666 So.2d 36 (Ala.Crim.App.), opinion after remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995);
 
 Holladay v. State,
 
 549 So.2d 122 (Ala.Crim.App.1988), aff'd, 549 So.2d 135 (Ala.1989);
 
 Siebert v. State,
 
 555 So.2d 772 (Ala.Crim.App.) aff'd, 555 So.2d 780 (Ala.1989);
 
 Peoples v. State,
 
 510 So.2d 554 (Ala.Crim.App.1986), aff'd, 510 So.2d 574 (Ala.1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
 

 Finally, we have searched the entire record for any error that may have adversely affected Brown’s substantial rights, and we have not found any.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 Accordingly, we affirm Brown’s convictions and sentence of death.
 

 AFFIRMED.
 

 WINDOM and MAIN, JJ., concur. WELCH and KELLUM, JJ., concur in the result.
 

 [1]
 

 . The State presented evidence that, at the time of trial, the three children had been legally adopted.
 

 [2]
 

 . Brown also argues that the State improperly called Washington for the sole purpose of impeaching her with the statement she had made to Mobbs. However, because we find that the trial court erroneously admitted evidence about Washington's statement to Mobbs on other grounds, we need not address this argument separately.